# BOOS ET AL. *v.* BARRY, MAYOR OF THE DISTRICT OF COLUMBIA, ET AL.

No. 86–803.   Argued November 9, 1987—Decided March 22, 1988

O'CONNOR, J., delivered the opinion of the Court with respect to Parts I, II–B, and V, in which BRENNAN, MARSHALL, STEVENS, and SCALIA, JJ., joined, and with respect to Parts III and IV, in which all participating Members joined, and an opinion with respect to Part II–A, in which STEVENS and SCALIA, JJ., joined. BRENNAN, J., filed an opinion concurring in part and concurring in the judgment, in which MARSHALL, J., joined, *post*, p. 334. REHNQUIST, C. J., filed an opinion concurring in part and dissenting in part, in which WHITE and BLACKMUN, JJ., joined, *post*, p. 338. KENNEDY, J., took no part in the consideration or decision of the case.

*Raymond D. Battocchi* argued the cause for petitioners. With him on the briefs were *Isaac N. Groner, Walter H. Fleischer, Alfred F. Belcuore,* and *James A. Bensfield.*

*Edward E. Schwab* argued the cause for respondents. With him on the brief was *Charles L. Reischel. Michael S. Arif* filed a brief for respondent Father R. David Finzer.

*Edwin S. Kneedler* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Wallace, Anthony J. Steinmeyer,* and *Barbara Biddle.**

JUSTICE O'CONNOR delivered the opinion of the Court, except as to Part II–A.

The question presented in this case is whether a provision of the District of Columbia Code, § 22–1115, violates the First Amendment. This section prohibits the display of any sign within 500 feet of a foreign embassy if that sign tends to bring that foreign government into "public odium" or "public disrepute." It also prohibits any congregation of three or more persons within 500 feet of a foreign embassy.

## I

Petitioners are three individuals who wish to carry signs critical of the Governments of the Soviet Union and Nicaragua on the public sidewalks within 500 feet of the embassies of those Governments in Washington, D. C. Petitioners Bridget M. Brooker and Michael Boos, for example, wish to display signs stating "RELEASE SAKHAROV" and "SOLIDARITY" in front of the Soviet Embassy. Petitioner J. Michael Waller wishes to display a sign reading "STOP THE KILLING" within 500 feet of the Nicaraguan Embassy. All of the petitioners also wish to congregate with two or more other persons within 500 feet of official foreign buildings.

Asserting that D. C. Code § 22–1115 (1981) prohibited them from engaging in these expressive activities, petition-

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *Arthur B. Spitzer, John A. Powell,* and *Elizabeth Symonds;* for the American Jewish Congress by *Joel H. Levy, Marc D. Stern, Lois C. Waldman,* and *Amy Adelson;* for the Legal Affairs Council et al. by *Wyatt B. Durrette, Jr.;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Paul D. Kamenar.*

*Seth P. Waxman* filed a brief for Geraldine M. Lipkin et al. as *amici curiae* urging affirmance.

ers, together with respondent Father R. David Finzer, brought a facial First Amendment challenge to that provision in the District Court for the District of Columbia. They named respondents, the Mayor and certain other law enforcement officials of the District of Columbia, as defendants. The United States intervened as *amicus curiae* supporting the constitutionality of the statute.

Congress enacted § 22–1115 in 1938, S. J. Res. 191, ch. 29, § 1, 52 Stat. 30 (1938), pursuant to its authority under Article I, § 8, cl. 10, of the Constitution to "define and punish . . . Offenses against the Law of Nations." Section 22–1115 reads in pertinent part as follows:

> "It shall be unlawful to display any flag, banner, placard, or device designed or adapted to intimidate, coerce, or bring into public odium any foreign government, party, or organization, or any officer or officers thereof, or to bring into public disrepute political, social, or economic acts, views, or purposes of any foreign government, party or organization . . . within 500 feet of any building or premises within the District of Columbia used or occupied by any foreign government or its representative or representatives as an embassy, legation, consulate, or for other official purposes . . . or to congregate within 500 feet of any such building or premises, and refuse to disperse after having been ordered so to do by the police authorities of said District."

The first portion of this statute, the "display" clause, applies to signs tending to bring a foreign government into public odium or public disrepute, such as signs critical of a foreign government or its policies. The display clause applies only to the display of signs, not to the spoken word. See *Zaimi* v. *United States*, 155 U. S. App. D. C. 66, 82, 476 F. 2d 511, 527 (1973). The second portion of the statute, the "congregation" clause, addresses a different concern. It prohibits congregation, which District of Columbia common

law defines as an assemblage of three or more people. *District of Columbia* v. *Reed*, Cr. No. 2021–67 (D. C. Ct. Gen. Sess., May 11, 1967) (reprinted in App. in *Kinoy* v. *District of Columbia*, 130 U. S. App. D. C. 290, 298, 400 F. 2d 761, 769 (1968)); *Hunter* v. *District of Columbia*, 47 App. D. C. 406, 409 (1918). Both of these prohibitions generally operate within a 500-foot zone surrounding embassies or consulates owned by foreign governments, but the statute also can extend to other buildings if foreign officials are inside for some official purpose.

The District Court granted respondents' motion for summary judgment, relying upon an earlier Court of Appeals decision, *Frend* v. *United States*, 69 App. D. C. 281, 100 F. 2d 691 (1938), cert. denied, 306 U. S. 640 (1939), that had sustained the statute against a similar First Amendment challenge. A divided panel of the Court of Appeals for the District of Columbia affirmed. *Finzer* v. *Barry*, 255 U. S. App. D. C. 19, 798 F. 2d 1450 (1986). Although it found *Frend* "persuasive precedent," the Court of Appeals thought *Frend* was not binding because it "was decided almost a half century ago and in the interval the Supreme Court has developed constitutional law in ways that must be taken into account." 255 U. S. App. D. C., at 23, 798 F. 2d, at 1454.

The Court of Appeals considered the two aspects of § 22–1115 separately. First, the court concluded that the display clause was a content-based restriction on speech. Relying, however, upon our decisions in *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 45 (1983), and *Carey* v. *Brown*, 447 U. S. 455, 461–462 (1980), the court nonetheless found it constitutional because it was justified by a compelling governmental interest and was narrowly drawn to serve that interest. Second, the Court of Appeals concluded that the congregation clause should be construed to authorize an order to disperse "only when the police reasonably believe that a threat to the security or peace of the embassy is present," and that as construed, the

congregation clause survived First Amendment scrutiny. 255 U. S. App. D. C., at 40, 798 F. 2d, at 1471.

We granted certiorari, 479 U. S. 1083 (1987). We now reverse the Court of Appeals' conclusion as to the display clause, but affirm as to the congregation clause.

## II

### A

Analysis of the display clause must begin with several important features of that provision. First, the display clause operates at the core of the First Amendment by prohibiting petitioners from engaging in classically political speech. We have recognized that the First Amendment reflects a "profound national commitment" to the principle that "debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964), and have consistently commented on the central importance of protecting speech on public issues. See, *e. g., Connick* v. *Myers,* 461 U. S. 138, 145 (1983); *NAACP* v. *Claiborne Hardware Co.,* 458 U. S. 886, 913 (1982); *Carey* v. *Brown, supra,* at 467. This has led us to scrutinize carefully any restrictions on public issue picketing. See, *e. g., United States* v. *Grace,* 461 U. S. 171 (1983); *Carey* v. *Brown, supra; Police Department of Chicago* v. *Mosley,* 408 U. S. 92 (1972).

Second, the display clause bars such speech on public streets and sidewalks, traditional public fora that "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague* v. *CIO,* 307 U. S. 496, 515 (1939) (Roberts, J.). In such places, which occupy a "special position in terms of First Amendment protection," *United States* v. *Grace,* 461 U. S., at 180, the government's ability to restrict expressive activity "is very limited." *Id.,* at 177.

Third, § 22–1115 is content based. Whether individuals may picket in front of a foreign embassy depends entirely upon whether their picket signs are critical of the foreign

government or not. One category of speech has been completely prohibited within 500 feet of embassies. Other categories of speech, however, such as favorable speech about a foreign government or speech concerning a labor dispute with a foreign government, are permitted. See D. C. Code § 22–1116 (1981).

Both the majority and dissent in the Court of Appeals accepted this common sense reading of the statute and concluded that the display clause was content based. The majority indicated, however, that it could be argued that the regulation was not content based. 255 U. S. App. D. C., at 38, n. 15, 798 F. 2d, at 1469, n. 15. Both respondents and the United States have now made such an argument in this Court. They contend that the statute is not content based because the government is not itself selecting between viewpoints; the permissible message on a picket sign is determined solely by the policies of a foreign government.

We reject this contention, although we agree the provision is not viewpoint based. The display clause determines which viewpoint is acceptable in a neutral fashion by looking to the policies of foreign governments. While this prevents the display clause from being directly viewpoint based, a label with potential First Amendment ramifications of its own, see, *e. g., City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 804 (1984); *Schacht* v. *United States*, 398 U. S. 58, 63 (1970), it does not render the statute content neutral. Rather, we have held that a regulation that "does not favor either side of a political controversy" is nonetheless impermissible because the "First Amendment's hostility to content-based regulation extends . . . to prohibition of public discussion of an entire topic." *Consolidated Edison Co.* v. *Public Service Comm'n*, 447 U. S. 530, 537 (1980). Here the government has determined that an entire category of speech — signs or displays critical of foreign governments — is not to be permitted.

We most recently considered the definition of a content-neutral statute in *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41 (1986). Drawing on prior decisions, we described "'content-neutral' speech restrictions as those that 'are *justified* without reference to the content of the regulated speech.' *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 771 (1976) (emphasis added)." *Id.*, at 48. The regulation at issue in *Renton* described prohibited speech by reference to the type of movie theater involved, treating "theaters that specialize in adult films differently from other kinds of theaters." *Id.*, at 47. But while the regulation in *Renton* applied only to a particular category of speech, its justification had nothing to do with that speech. The content of the films being shown inside the theaters was irrelevant and was not the target of the regulation. Instead, the ordinance was aimed at the "*secondary effects* of such theaters in the surrounding community," *ibid.* (emphasis in original), effects that are almost unique to theaters featuring sexually explicit films, *i. e.*, prevention of crime, maintenance of property values, and protection of residential neighborhoods. In short, the ordinance in *Renton* did not aim at the suppression of free expression.

Respondents attempt to bring the display clause within *Renton* by arguing that here too the real concern is a secondary effect, namely, our international law obligation to shield diplomats from speech that offends their dignity. We think this misreads *Renton*. We spoke in that decision only of *secondary* effects of speech, referring to regulations that apply to a particular category of speech because the regulatory targets happen to be associated with that type of speech. So long as the justifications for regulation have nothing to do with content, *i. e.*, the desire to suppress crime has nothing to do with the actual films being shown inside adult movie theaters, we concluded that the regulation was properly analyzed as content neutral.

Regulations that focus on the direct impact of speech on its audience present a different situation. Listeners' reactions to speech are not the type of "secondary effects" we referred to in *Renton*. To take an example factually close to *Renton*, if the ordinance there was justified by the city's desire to prevent the psychological damage it felt was associated with viewing adult movies, then analysis of the measure as a content-based statute would have been appropriate. The hypothetical regulation targets the direct impact of a particular category of speech, not a secondary feature that happens to be associated with that type of speech.

Applying these principles to the case at hand leads readily to the conclusion that the display clause is content-based. The clause is justified *only* by reference to the content of speech. Respondents and the United States do not point to the "secondary effects" of picket signs in front of embassies. They do not point to congestion, to interference with ingress or egress, to visual clutter, or to the need to protect the security of embassies. Rather, they rely on the need to protect the dignity of foreign diplomatic personnel by shielding them from speech that is critical of their governments. This justification focuses *only* on the content of the speech and the direct impact that speech has on its listeners. The emotive impact of speech on its audience is not a "secondary effect." Because the display clause regulates speech due to its potential primary impact, we conclude it must be considered content-based.

B

Our cases indicate that as a *content-based* restriction on *political speech* in a *public forum*, § 22–1115 must be subjected to the most exacting scrutiny. Thus, we have required the State to show that the "regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S., at 45. Accord, *Board of Airport Comm'rs of Los Angeles* v. *Jews for Jesus*, 482 U. S.

569, 572–573 (1987); *Cornelius* v. *NAACP Legal Defense & Educational Fund, Inc.*, 473 U. S. 788, 800 (1985); *United States* v. *Grace*, 461 U. S., at 177.

We first consider whether the display clause serves a compelling governmental interest in protecting the dignity of foreign diplomatic personnel. Since the dignity of foreign officials will be affronted by signs critical of their governments or governmental policies, we are told, these foreign diplomats must be shielded from such insults in order to fulfill our country's obligations under international law.

As a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide "adequate 'breathing space' to the freedoms protected by the First Amendment." *Hustler Magazine, Inc.* v. *Falwell, ante,* at 56. See also, *e. g., New York Times Co.* v. *Sullivan,* 376 U. S., at 270. A "dignity" standard, like the "outrageousness" standard that we rejected in *Hustler,* is so inherently subjective that it would be inconsistent with "our longstanding refusal to [punish speech] because the speech in question may have an adverse emotional impact on the audience." *Hustler Magazine, supra,* at 55.

We are not persuaded that the differences between foreign officials and American citizens require us to deviate from these principles here. The dignity interest is said to be compelling in this context primarily because its recognition and protection is part of the United States' obligations under international law. The Vienna Convention on Diplomatic Relations, April 18, 1961, [1972] 23 U. S. T. 3227, T. I. A. S. No. 7502, which all parties agree represents the current state of international law, imposes on host states

"[the] special duty to take all appropriate steps to protect the premises of the mission against any intrusion or damage and to prevent any disturbance of the peace of the mission or impairment of its dignity." *Id.,* at 3237–3238, Art. 22.

As a general proposition, it is of course correct that the United States has a vital national interest in complying with international law. The Constitution itself attempts to further this interest by expressly authorizing Congress "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations." U. S. Const., Art. I, § 8, cl. 10. Cf. The Federalist No. 3, p. 43 (C. Rossiter ed. 1961) (J. Jay). Moreover, protecting foreign emissaries has a long history and noble purpose. In this country national concern for the protection of ambassadors and foreign ministers even predates the Constitution. In 1781 the Continental Congress adopted a resolution calling on the States to enact laws punishing "infractions of the immunities of ambassadors and other public ministers, authorised and received as such by the United States in Congress assembled," targeting in particular "violence offered to their persons, houses, carriages and property." 21 J. Continental Cong. 1136–1137 (G. Hunt ed. 1912).

The need to protect diplomats is grounded in our Nation's important interest in international relations. As a leading commentator observed in 1758, "[i]t is necessary that nations should treat and hold intercourse together, in order to promote their interests,—to avoid injuring each other,—and to adjust and terminate their disputes." E. Vattel, The Law of Nations 452 (J. Chitty ed. 1844) (translation). This observation is even more true today given the global nature of the economy and the extent to which actions in other parts of the world affect our own national security. Diplomatic personnel are essential to conduct the international affairs so crucial to the well-being of this Nation. In addition, in light of the concept of reciprocity that governs much of international law in this area, see C. Wilson, Diplomatic Privileges and Immunities 32 (1967), we have a more parochial reason to protect foreign diplomats in this country. Doing so ensures that similar protections will be accorded those that we send abroad to represent the United States, and thus serves our

national interest in protecting our own citizens. Recent history is replete with attempts, some unfortunately successful, to harass and harm our ambassadors and other diplomatic officials. These underlying purposes combine to make our national interest in protecting diplomatic personnel powerful indeed.

At the same time, it is well established that "no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution." *Reid* v. *Covert*, 354 U. S. 1, 16 (1957). See 1 Restatement of Foreign Relations Law of the United States § 131, Comment *a*, p. 53 (Tent. Draft No. 6, Apr. 12, 1985) ("[R]ules of international law and provisions of international agreements of the United States are subject to the Bill of Rights and other prohibitions, restrictions or requirements of the Constitution and cannot be given effect in violation of them").

Thus, the fact that an interest is recognized in international law does not automatically render that interest "compelling" for purposes of First Amendment analysis. We need not decide today whether, or to what extent, the dictates of international law could ever require that First Amendment analysis be adjusted to accommodate the interests of foreign officials. Even if we assume that international law recognizes a dignity interest and that it should be considered sufficiently "compelling" to support a content-based restriction on speech, we conclude that § 22–1115 is not narrowly tailored to serve that interest. See, *e. g.*, *Perry Education Assn.*, 460 U. S., at 45; *Board of Airport Comm'rs of Los Angeles*, 482 U. S., at 573.

The most useful starting point for assessing § 22–1115 is to compare it with an analogous statute adopted by Congress, which is the body primarily responsible for implementing our obligations under the Vienna Convention. Title 18 U. S. C. § 112(b)(2) subjects to criminal punishment willful acts or attempts to "intimidate, coerce, threaten, or harass a foreign

official or an official guest or obstruct a foreign official in the performance of his duties."

Its legislative history reveals that § 112 was developed as a deliberate effort to implement our international obligations. See, *e. g.*, 118 Cong. Rec. 27112–27113 (1972). At the same time, the history reflects a substantial concern with the effect of any such legislation on First Amendment freedoms. For example, the original provision contained a prohibition on willful acts or attempts to "intimidate, coerce, threaten, or harass . . . or obstruct a foreign official," as does the current version of § 112. In a portion with similarities to the display clause, however, it also punished anyone who

> "parades, pickets, displays any flag, banner, sign, placard, or device, or utters any word, phrase, sound, or noise, for the purpose of intimidating, coercing, threatening, or harassing any foreign official or obstructing him in the performance of his duties." Act for Protection of Foreign Official Guests of the United States, Pub. L. 92–539, Title III, § 301(c)(1), 86 Stat. 1070, 1073 (1972).

Concerned with the effects that such a provision might have on First Amendment freedoms, the Senate added a new subsection, which directed:

> "[N]othing contained in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the first amendment to the Constitution of the United States." § 301(e), 86 Stat. 1073.

See S. Rep. No. 92–1105, p. 19 (1972).

After the 1972 passage of § 112 in this form, congressional concerns about its impact on First Amendment freedoms apparently escalated rather than abated. In 1976, Congress revisited the area and repealed the antipicketing provision, leaving in place only the current prohibition on willful acts or attempts to "intimidate, coerce, threaten, or harass a foreign

official." § 112(b)(2). In modifying § 112, Congress was motivated by First Amendment concerns:

> "This language [of the original anti-picketing provision] raises serious Constitutional questions because it appears to include within its purview conduct and speech protected by the First Amendment." S. Rep. No. 94–1273, p. 8, n. 9 (1976); H. R. Rep. No. 94–1614, p. 6, n. 9 (1976).

Thus, after a careful balancing of our country's international obligations with our Constitution's protection of free expression, Congress has determined that § 112 adequately satisfies the Government's interest in protecting diplomatic personnel outside the District of Columbia. It is the necessary, "appropriate" step that Congress has enacted to fulfill our international obligations. Cf. Vienna Convention on Diplomatic Relations, Art. 22, § 2, 23 U. S. T., at 3237 ("special duty to take all appropriate steps").

Section 112 applies to all conduct "within the United States but outside the District of Columbia." § 112(b)(3). In the legislative history, the exclusion of the District from the statute's reach is explained with reference to § 22–1115; Congress was informed that a "similar" statute already applied inside the District. S. Rep. No. 92–1105, *supra*, at 19; H. R. Rep. No. 92–1268, p. 5 (1972). The two statutes, however, are not identical, and the differences between them are constitutionally significant. In two obvious ways, § 112 is considerably less restrictive than the display clause of § 22–1115. First and foremost, § 112 is not narrowly directed at the content of speech but at any activity, including speech, that has the prohibited effects. Moreover, § 112, unlike § 22–1115, does not prohibit picketing; it only prohibits activity undertaken to "intimidate, coerce, threaten, or harass." Indeed, unlike the display clause, even the repealed antipicketing portion of § 112 permitted peaceful picketing.

Given this congressional development of a significantly less restrictive statute to implement the Vienna Convention,

there is little force to the argument that we should give deference to a supposed congressional judgment that the Convention demands the more problematic approach reflected in the display clause. If § 112 is all that is necessary in the rest of the country, petitioners contend it should be all that is necessary in the District of Columbia. The only counterargument offered by respondents is that the District has a higher concentration of foreign embassies than other locales and that a more restrictive statute is therefore necessary. But this is arguably factually incorrect (New York City is reported to have a greater number of foreign embassies, missions, or consulates than does the District of Columbia, see Note, Regulating Embassy Picketing in the Public Forum, 55 Geo. Wash. L. Rev. 908, 928, n. 140 (1987)), and logically beside the point since the need to protect "dignity" is equally present whether there is one embassy or mission or one hundred. The United States points to Congress' exclusive legislative authority over the District of Columbia, U. S. Const., Art. I, § 8, cl. 17, and argues that this justifies more extensive measures. We fail to see, however, why the potential legislative power to enact more extensive measures makes such measures necessary.

Congressional action since the Court of Appeals' ruling in this case casts even further doubt on the validity of the display clause and causes one to doubt whether that court would have reached the same result under the law as it now stands. In § 1302 of the Omnibus Diplomatic Security and Antiterrorism Act of 1986, Congress said:

> "(1) [T]he District of Columbia law concerning demonstrations near foreign missions in the District of Columbia (D. C. Code, sec. 22–1115) may be inconsistent with the reasonable exercise of the rights of free speech and assembly, that law may have been selectively enforced, and peaceful demonstrators may have been unfairly arrested under the law;

"(2) the obligation of the United States to provide adequate security for the missions and personnel of foreign governments must be balanced with the reasonable exercise of the rights of free speech and assembly; and

"(3) therefore, the Council of the District of Columbia should review and, if appropriate, make revisions·in the laws of the District of Columbia concerning demonstrations near foreign missions, in consultation with the Secretary of State and the Secretary of the Treasury." Pub. L. 99–399, § 1302, 100 Stat. 853, 897.

This sense-of-the-Congress resolution originated as a proposal to repeal § 22–1115 directly and to amend § 112 to include the District. The sponsor of this proposal noted that in excluding the District from the reach of § 112, Congress had apparently assumed that § 22–1115 and § 112 were similar, when in fact the two laws are "in no way similar." 132 Cong. Rec. 15329 (1986) (Sen. Grassley). The Senate passed the bill repealing § 22–1115, see *ibid.*, but the Conference Committee was concerned with objections to congressional repeal arising from the tenets of "home rule" for the District of Columbia. See *id.*, at 20913. Cf. District of Columbia Self-Government and Governmental Reorganization Act, Pub L. 93–198, 87 Stat. 774 (establishing home rule). These objections led Congress to replace a repeal of § 22–1115 with the sense-of-the-Congress language quoted above.

The District of Columbia government has responded to the congressional request embodied in the Omnibus Act by repealing § 22–1115. The repeal is contingent, however, on Congress' first acting to extend § 112 to the District. See Protection for Foreign Officials, Official Guests, and Internationally Protected Persons Amendment Act of 1987, § 3, D. C. Act 7–138, 35 D. C. Reg. 728–729 (Feb. 5, 1988). Cf. § 112(b)(3) (Section applies "within the United States but outside the District of Columbia").

While this most recent round of legislative action concerning § 22–1115 has not yet led to making the repeal of that provision effective, it has undercut significantly respondents' defense of the display clause. When considered together with earlier congressional action implementing the Vienna Convention, the claim that the display clause is sufficiently narrowly tailored is gravely weakened: if ever it did so, Congress no longer considers this statute necessary to comply with our international obligations. Relying on congressional judgment in this delicate area, we conclude that the availability of alternatives such as § 112 amply demonstrates that the display clause is not crafted with sufficient precision to withstand First Amendment scrutiny. It may serve an interest in protecting the dignity of foreign missions, but it is not narrowly tailored; a less restrictive alternative is readily available. Cf. *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 280, n. 6 (1986) (plurality opinion). Thus, even assuming for present purposes that the dignity interest is "compelling," we hold that the display clause of § 22–1115 is inconsistent with the First Amendment.

### III

Petitioners initially attack the congregation clause by arguing that it confers unbridled discretion upon the police. In addressing such a facial overbreadth challenge, a court's first task is to ascertain whether the enactment reaches a substantial amount of constitutionally protected conduct. *Houston* v. *Hill*, 482 U. S. 451, 458–459 (1987); *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 494 (1982). In making this assessment, we consider the actual text of the statute as well as any limiting constructions that have been developed. *Kolender* v. *Lawson*, 461 U. S. 352, 355 (1983); *Hoffman Estates, supra*, at 494, n. 5.

The congregation clause makes it unlawful

> "to congregate within 500 feet of any [embassy, legation, or consulate] and refuse to disperse after having been ordered so to do by the police." § 22–1115.

Standing alone, this text is problematic both because it applies to *any* congregation within 500 feet of an embassy for *any* reason and because it appears to place no limits at all on the dispersal authority of the police. The Court of Appeals, however, has provided a narrowing construction that alleviates both of these difficulties.

The Court of Appeals, we must first observe, read the congregation clause as distinct from the display clause, so the constitutional infirmity of the latter need not affect the former. See 255 U. S. App. D. C., at 41, n. 17, 798 F. 2d, at 1472, n. 17. Second, the Court of Appeals followed the lead of several earlier decisions, see, *e. g.*, *United States* v. *Travers*, 98 Daily Wash. L. Rptr. 1505 (D. C. Ct. Gen. Sess. April 2, 1970), and concluded that the statute permits the dispersal only of congregations that are directed at an embassy; it does not grant "police the power to disperse for reasons having nothing to do with the nearby embassy." 255 U. S. App. D. C., at 41, 798 F. 2d, at 1472. Finally, the Court of Appeals further circumscribed police discretion by holding that the statute permits dispersal "only when the police reasonably believe that a threat to the security or peace of the embassy is present." *Id.*, at 40, 798 F. 2d, at 1471.

Petitioners protest that the Court of Appeals was without authority to narrow the statute. According to petitioners, § 22–1115 must be considered to be state legislation, which brings it within the sweep of prior decisions indicating that federal courts are without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent. See, *e. g.*, *Grayned* v. *Rockford*, 408 U. S. 104, 110 (1972); *Gooding* v. *Wilson*, 405 U. S. 518, 520–521 (1972). Even assuming that the District of Columbia could be considered a State for this purpose, the argument overlooks the fact that § 22–1115 was enacted by Congress, not by the District of Columbia Council. Cf. *Whalen* v. *United States*, 445 U. S. 684, 687–688 (1980). It is well settled that federal courts have the power to adopt

narrowing constructions of federal legislation. See, *e. g.*, *New York* v. *Ferber*, 458 U. S. 747, 769, n. 24 (1982); *United States* v. *Thirty-seven Photographs*, 402 U. S. 363, 368–370 (1971). Indeed, the federal courts have the duty to avoid constitutional difficulties by doing so if such a construction is fairly possible. See, *e. g.*, *Ferber*, *supra*, at 769, n. 24; *Thirty-seven Photographs*, *supra*, at 369; *Schneider* v. *Smith*, 390 U. S. 17, 26–27 (1968). While the original congressional resolution is now part of the District of Columbia Code, this administrative transfer did not diminish the national interest in the congregation clause. As counsel for respondents indicated at oral argument, there "is no independent District of Columbia interest here." Tr. of Oral Arg. 28. Accordingly, we see no barrier to the Court of Appeals' adoption of a narrowing construction.

So narrowed, the congregation clause withstands First Amendment overbreadth scrutiny. It does not reach a substantial amount of constitutionally protected conduct; it merely regulates the place and manner of certain demonstrations. Unlike a general breach of the peace statute, see, *e. g.*, *Cox* v. *Louisiana*, 379 U. S. 536 (1965), the congregation clause is site specific; it applies only within 500 feet of foreign embassies. Cf. *Cox* v. *Louisiana*, 379 U. S. 559, 568, n. 1 (1965) (ordinance prohibiting certain picketing "near" a courthouse upheld; § 22–1115 cited with approval as being less vague due to specification of 500 feet); *Grayned*, *supra*, at 112, 120–121 (upholding ban on picketing near a school; special nature of place relevant in judging reasonableness of restraint). Moreover, the congregation clause does not prohibit peaceful congregations; its reach is limited to groups posing a security threat. As we have noted, "where demonstrations turn violent, they lose their protected quality as expression under the First Amendment." *Grayned*, *supra*, at 116. These two limitations prevent the congregation clause from reaching a substantial amount of constitu-

tionally protected conduct and make the clause consistent with the First Amendment.

Petitioners argue that even as narrowed by the Court of Appeals, the congregation clause is invalid because it is impermissibly vague. In particular, petitioners focus on the word "peace," which is not further defined or limited. We rejected an identical argument in *Grayned, supra.* That case concerned an ordinance that prohibited persons near schools from "disturb[ing] the peace" of the schools. 408 U. S., at 107–108. We held that given the "particular context" of the ordinance it gave fair notice of its scope: "Although the prohibited quantum of disturbance is not specified in the ordinance, it is apparent from the statute's announced purpose that the measure is whether normal school activity has been or is about to be disrupted." *Id.*, at 112. Section 22–1115 presents the same situation. It is crafted for a particular context and given that context, it is apparent that the "prohibited quantum of disturbance" is whether normal embassy activities have been or are about to be disrupted. The statute communicates its reach in words of common understanding, *ibid.; Cameron* v. *Johnson*, 390 U. S. 611, 616 (1968), and it accordingly withstands petitioners' vagueness challenge.

## IV

In addition to their First Amendment challenges to the display clause and the congregation clause, petitioners raise an equal protection argument. Relying on *Police Department of Chicago* v. *Mosley*, 408 U. S. 92 (1972), and *Carey* v. *Brown*, 447 U. S. 455 (1980), petitioners contend that both the display clause and the congregation clause violate equal protection by virtue of § 22–1116, which excludes labor picketing from the general prohibitions of § 22–1115:

> "[N]othing contained in [§ 22–1115] shall be construed to prohibit picketing, as a result of bona fide labor disputes regarding the alteration, repair, or construction of either buildings or premises occupied, for business pur-

poses, wholly or in part, by representatives of foreign governments."

No doubt the primary intent of § 22–1116 was to ensure that the display clause did not prohibit labor picketing, since "picketing" is most directly implicated in the display clause. Even if § 22–1116 were to exempt the display of labor signs that offended the dignity of foreign officials from the display clause's general ban on such signs, and thereby raise equal protection concerns, we have already concluded that the display clause is contrary to the First Amendment. Accordingly, the only provision to which § 22–1116 conceivably could apply is the congregation clause. And the Court of Appeals has already construed that provision to apply only to congregations that threaten the security or peace of an embassy. Therefore, peaceful congregations, including peaceful labor congregations, are not prohibited.

Accordingly, only if § 22–1116 is construed to protect *violent* labor congregations, will there be any unequal treatment of nonlabor and labor picketing which could run afoul of the Equal Protection Clause. In our view, § 22–1116 should not be interpreted in this manner. First, it is well established that statutes should be construed to avoid constitutional questions if such a construction is fairly possible. See, *e. g.*, *New York* v. *Ferber, supra*, at 769, n. 24; *United States* v. *Thirty-seven Photographs, supra.* Second, the face of the statute admonishes only that nothing shall "prohibit picketing." As narrowed by the Court of Appeals, the congregation clause does not "prohibit picketing" at all, it merely regulates the place and manner of certain demonstrations. The labor proviso is thus completely consistent with the congregation clause. Third, § 22–1116 evinces an intent to protect only "bona fide" labor disputes. We think it safe to conclude that an intent to protect such "good faith" disagreements falls short of an intent to insulate violent conduct. Indeed, it would be unreasonable to construe this statute in such a way

that the sole purpose of § 22–1116 would be to protect violent labor congregations.

The intended function of § 22–1116 is largely pre-empted by our conclusion that the display clause is invalid. Viewing the section in this way eliminates any potential unequal treatment of nonlabor and labor congregations. Accordingly, in our view, § 22–1116 does not violate the Equal Protection Clause.

## V

We conclude that the display clause of § 22–1115 is unconstitutional on its face. It is a content-based restriction on political speech in a public forum, and it is not narrowly tailored to serve a compelling state interest. We also conclude that the congregation clause, as narrowed by the Court of Appeals, is not facially unconstitutional. Accordingly, the judgment of the Court of Appeals is reversed in part and affirmed in part.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in part and concurring in the judgment.

I join all but Part II–A of JUSTICE O'CONNOR's opinion. I also join Part II–A to the extent it concludes that even under the analysis set forth in *Renton* v. *Playtime Theatres, Inc.,* 475 U. S. 41 (1986), the display clause constitutes a content-based restriction on speech that merits strict scrutiny. Whatever "secondary effects" means, I agree that it cannot include listeners' reactions to speech. Cf. *Hustler Magazine, Inc.* v. *Falwell, ante,* p. 46. I write separately, however, to register my continued disagreement with the proposition that an otherwise content-based restriction on speech can be recast as "content neutral" if the restriction "aims" at "secondary effects" of the speech, see *Renton, supra,* at 55 (BRENNAN, J., joined by MARSHALL, J., dissent-

ing), and to object to JUSTICE O'CONNOR's assumption that the *Renton* analysis applies not only outside the context of businesses purveying sexually explicit materials but even to political speech.

The dangers and difficulties posed by the *Renton* analysis are extensive. Although in this case it is easy enough to determine that the display clause does not aim at a "secondary effect" of speech, future litigants are unlikely to be so bold or so forthright as to defend a restriction on speech with the argument that the restriction aims to protect listeners from the indignity of hearing speech that criticizes them. Rather, they are likely to defend content-based restrictions by pointing, as JUSTICE O'CONNOR suggests, to secondary effects like "congestion, . . . visual clutter, or . . . security . . . ." *Ante*, at 321. But such secondary effects offer countless excuses for content-based suppression of political speech. No doubt a plausible argument could be made that the political gatherings of some parties are more likely than others to attract large crowds causing congestion, that picketing for certain causes is more likely than other picketing to cause visual clutter, or that speakers delivering a particular message are more likely than others to attract an unruly audience. Our traditional analysis rejects such *a priori* categorical judgments based on the content of speech, *Police Department of Chicago* v. *Mosley,* 408 U. S. 92, 100–101 (1972), requiring governments to regulate based on actual congestion, visual clutter, or violence rather than based on predictions that speech with a certain content will induce those effects. The *Renton* analysis, however, creates a possible avenue for governmental censorship whenever censors can concoct "secondary" rationalizations for regulating the content of political speech.

Moreover, the *Renton* analysis provides none of the clear lines or sanctuaries the First Amendment demands. The traditional approach sets forth a bright-line rule: any restriction on speech, the application of which turns on the content

of the speech, is a content-based restriction regardless of the motivation that lies behind it. That, to my mind, has always been implicit in the fact that we term the test a "content-based" test rather than a "motivation-based" test. The traditional rule thus provides clear guidance. Governments can ascertain the scope of impermissible regulation. Individuals can ascertain the scope of their constitutional protection. The *Renton* analysis, in contrast, plunges courts into the morass of legislative motive, a notoriously hazardous and indeterminate inquiry, particularly where, as under the *Renton* approach, the posited purpose flies in the face of plain statutory language. See, *e. g.*, *United States* v. *O'Brien*, 391 U. S. 367, 383–384 (1968). And even where the motivational inquiry can be resolved, the *Renton* approach saddles courts with a fuzzy distinction between the secondary and direct effects of speech, a distinction that is likely to prove just as unworkable as other direct/indirect distinctions in constitutional jurisprudence have proved. Compare, *e. g.*, *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274 (1977) (criticizing and wisely rejecting the distinction between direct and indirect taxation of interstate commerce); L. Tribe, American Constitutional Law § 6–4, p. 408 (2d ed. 1988) (noting that the Court abandoned a similar distinction between direct and indirect regulation of interstate commerce).

This indeterminacy is hardly *Renton*'s worst flaw, for the root problem with the *Renton* analysis is that it relies on the dubious proposition that a statute which on its face discriminates based on the content of speech aims not at content but at some secondary effect that does not itself affect the operation of the statute. But the inherently ill-defined nature of the *Renton* analysis certainly exacerbates the risk that many laws designed to suppress disfavored speech will go undetected. Although an inquiry into motive is sometimes a useful supplement, the best protection against governmental attempts to squelch opposition has never lain in our ability to assess the purity of legislative motive but rather in the re-

quirement that the government act through content-neutral means that restrict expression the government favors as well as expression it disfavors. In Justice Jackson's felicitous words of nearly 40 years ago: "Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation." *Railway Express Agency, Inc. v. New York*, 336 U. S. 106, 113 (1949) (concurring opinion). Moreover, even if we could be confident about our ability to determine that a content-based law was intended to aim at the "secondary effects" of certain types of speech, such a law would still offend fundamental free speech interests by denying speakers the equal right to engage in speech and by denying listeners the right to an undistorted debate. These rights are all the more precious when the speech subject to unequal treatment is political speech and the debate being distorted is a political debate. And the dangers, the uncertainties, and the damage to free and equal debate caused by the *Renton* analysis are all the more regrettable given the unlikelihood of any legitimate governmental interest in a content-based restriction on speech (especially political speech) and the ample alternatives governments have for advancing content-neutral goals through content-neutral regulation. At least in *Renton* there was a plausible argument that the secondary effect sought to be regulated — the social decay of neighborhoods — could not be directly regulated in the way that congestion, visual clutter, or violence can be. But absent a demonstrable showing of that type of necessity, it is hard to see how a convincing argument could ever be made that a content-based regulation does not aim at content. Nor can I conceive of any situation where a plausible argument could be made that regulating the content of political speech is necessary to regulate content-neutral secondary effects.

Until today, the *Renton* analysis, however unwise, had at least never been applied to political speech. *Renton* itself seemed to confine its application to "businesses that purvey

sexually explicit materials." 475 U. S., at 49, and n. 2. Indeed, the same day that we decided *Renton*, three of the Justices who joined it reiterated the traditional test in *Pacific Gas & Electric Co.* v. *Public Utilities Comm'n*, 475 U. S. 1, 20 (1986) (plurality opinion of Powell, J.) ("For a time, place, or manner regulation to be valid, it must be neutral as to the content of the speech to be regulated"). See also *Widmar* v. *Vincent*, 454 U. S. 263 (1981) (evaluating a prohibition on the religious use of university buildings under the strict scrutiny applicable to content-based regulations even though the prohibition was aimed at avoiding perceived Establishment Clause problems, a secondary effect of the speech).* True, today's application of the *Renton* analysis to political speech is dictum: the challenged statute would be treated as content based under either *Renton* or the traditional approach, and the opinion could easily have stated simply that we need not reach the issue whether *Renton* applies to political speech because even under *Renton* the law constitutes a content-based restriction. It is nonetheless ominous dictum, for it could set the Court on a road that will lead to the evisceration of First Amendment freedoms. I can only hope that, when the Court is actually presented with a case involving a content-based regulation of political speech that allegedly aims at so-called secondary effects of that speech, the Court will recognize and avoid the pitfalls of the *Renton* approach.

CHIEF JUSTICE REHNQUIST, with whom JUSTICES WHITE and BLACKMUN join, concurring in part and dissenting in part.

For the reasons stated by Judge Bork in his majority opinion below, I would uphold that portion of § 22–1115 of the District of Columbia Code that prohibits the display of any sign within 500 feet of a foreign embassy if that sign tends to

---

*And, as suggested above, strong arguments exist for, at a minimum, confining the *Renton* analysis to situations where the secondary effects sought to be regulated are not amenable to direct regulation.

bring that foreign government into "public odium" or "public disrepute." However, I agree with JUSTICE O'CONNOR that §22–1115's congregation clause is not unconstitutional and that the exemption for labor picketing does not violate the Equal Protection Clause, so I join in Parts III and IV of the majority opinion.