**[This opinion has been published in *Ohio Official Reports* at 76 Ohio St.3d 304.]**

CITY OF SEVEN HILLS, APPELLEE, *v.* ARYAN NATIONS ET. AL.; WEISS,
APPELLANT.

**[Cite as *Seven Hills v. Aryan Nations*, 1996-Ohio-394.]**

*Constitutional law—Free speech—Trial court abuses its discretion In fashioning
an injunction limiting picketing in a residential area, when.*

(No. 95-730—Submitted May 1, 1996 Decided August 14, 1996.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 66754.

———————————

{¶ 1} In fashioning an injunction limiting picketing in a residential area, a trial court abuses its discretion by completely banning simultaneous picketing by groups expressing contrary views rather than narrowly tailoring the injunction to serve compelling government interests.

{¶ 2} After the Israeli Supreme Court reversed John Demjanjuk's conviction for Nazi war crimes, the Israeli government released Demjanjuk from prison and permitted him to return to his home in the city of Seven Hills, Ohio. Demjanjuk lives in a residential neighborhood, on a narrow street without sidewalks. In anticipation of public reaction to Demjanjuk's return, Seven Hills passed an emergency ordinance prohibiting picketing "before, or about, or in the immediate vicinity of the land upon which the dwelling of any individual is situated." Seven Hills Ordinance No. 79-1993.

{¶ 3} Thereafter, appellant-defendant, Rabbi Avraham Weiss, leader of the Coalition for Jewish Concerns ("CJC"), led a group of approximately thirty people in a picket in front of Demjanjuk's home. Rabbi Weiss protested Demjanjuk's return to the United States and endeavored to tell the public that Demjanjuk was "not a victim *** not a hero *** [but] a Nazi." The following day, Weiss led a group of approximately forty people in protest in front of Demjanjuk's residence.

Several days later, members of the Ku Klux Klan ("KKK"), dressed in their traditional regalia, picketed in front of Demjanjuk's residence to show their support for him. All of the protests were peaceful and without incident or arrests, although they did attract significant media attention.

{¶ 4} Following these demonstrations, Seven Hills filed a complaint for a temporary restraining order and permanent injunctive relief against Weiss, the Aryan Nations and the KKK, among others. Seven Hills requested the court's aid in enforcing Ordinance No. 79-1993, claiming that continued picketing threatened the "well-being, tranquillity, and privacy" of the residents and caused the city to have "urgent concern" for the "real potential for danger to [the picketers] and other participants in counter-demonstrations."

{¶ 5} The trial court issued the temporary restraining order and, after conducting an evidentiary hearing, granted a preliminary injunction. Both orders restricted the number of picketers to thirty, limited the time periods during which they could picket to weekdays from 10:00 a.m. to 12:00 p.m. and 2:00 p.m. to 4:00 p.m., required groups to register for a time period, and prohibited opposing groups from picketing simultaneously.

{¶ 6} Although the trial court held that Ordinance No. 79-1993 violated the First Amendment, it nonetheless granted Seven Hills permanent injunctive relief because "the City clearly demonstrated that spontaneous residential picketing, in the context of the return of John Demjanjuk to the United States, poses a clear impending danger of irreparable injury to the City and its residents." The permanent injunction modified the previous injunction by reducing the number of picketers to twenty-five and by permitting picketing seven days a week. The permanent injunction continued to restrict the picketing time periods, to require each group to register in advance, and to prohibit simultaneous picketing by groups on opposing sides of the issue.

**{¶ 7}** Seven Hills appealed the trial court's decision holding Ordinance No. 79-1993 unconstitutional, while Weiss cross-appealed various aspects of the permanent injunction as violating the First Amendment. The court of appeals agreed that the ordinance was unconstitutional and that the trial court had not abused its discretion in framing the permanent injunctive relief.

**{¶ 8}** This cause is now before the court upon the allowance of a discretionary appeal.

_____

*Allen A. Kacenjar*, Seven Hills Law Director, and Sean F. Berney, Assistant Law Director, for appellee.

*Raymond Vasvari* and *Kevin Francis O'Neill*, for appellant.

_____

**COOK, J.**

**{¶ 9}** This case presents the single issue of whether the permanent injunction's prohibition on simultaneous picketing by groups with opposing viewpoints violates the United States Constitution's guarantee of free speech.[1] Seven Hills does not appeal the ruling that the ordinance was unconstitutional, nor does Weiss challenge the injunction's registration requirements, time restrictions, or limitation on the number of picketers. For the following reasons, we reverse the court of appeals and find that the trial court abused its discretion in completely banning simultaneous expression of contrary views.

**{¶ 10}** It is well settled that picketing is a "pristine and classic" exercise of First Amendment freedoms, *Edwards v. South. Carolina* (1963), 372 U.S. 229, 235, 83 S.Ct.680, 683, 9 L.Ed.2d 697, 707, striking at the core of our nation's commitment to the principle that "debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 270,

---

1. The First Amendment to the United States Constitution states, "Congress shall make no law *** abridging the freedom of speech ***" and is applicable to the states via the Fourteenth Amendment.

84 S.Ct. 710, 721, 11 L.Ed.2d 686, 701. While citizens do not enjoy the absolute right to free speech, neither does the state enjoy the absolute right to regulate speech. Rather, the degree to which a state may regulate speech depends upon the place of that speech. *Frisby v. Schultz* (1988), 487 U.S. 474, 479, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420, 428, citing *Perry Edn. Assn. v. Perry Local Educators' Assn.* (1983), 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794, 804. In this case, the picketing takes place on the street in front of Demjanjuk's home, a traditional or "quintessential" public forum regardless of its physical narrowness and residential character. See *Frisby*, 487 U.S. at 481, 108 S.Ct. at 2500, 101 L.Ed.2d at 429.

{¶ 11} The constitutionality of restrictions on speech in a public forum is measured by whether the particular restriction is content-based or content-neutral. *Perry Edn. Assn.*, 460 U.S. at 45, 103 S.Ct. at 955, 74 L.Ed.2d at 804. Content-neutral speech restrictions are those that are "'justified without reference to the content of the regulated speech.'" *Ward v. Rock Against Racism* (1989), 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661, 675, quoting *Clark v. Community for Creative Non-Violence* (1984), 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221, 227; *Boos v. Barry* (1988), 485 U.S. 312, 320, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333, 344. On the other hand, restrictions that focus on the direct impact of the speech on its audience are properly analyzed as content-based. *Boos*, 485 U.S. at 321, 108 S.Ct. at 1163-1164, 99 L.Ed.2d at 344.

{¶ 12} In determining whether a restriction is content-based or content-neutral, our primary consideration is the purpose of the restriction. *Madsen v. Women's Health Ctr., Inc.* (1994), 512 U.S __, __, 114 S.Ct. 2516, 2523, 129 L.Ed.2d 593, 606; *Ward*, 491 U.S. at 791, 109 S.Ct. at 2753-2754, 105 L.Ed.2d at 675. In *Madsen*, the court held that an injunction which restricted speech by antiabortion picketers was not content-based because it was premised on that group's repeated violations of court orders. 512 U.S. at __, 114 S.Ct. at 2523-2524,

129 L.Ed.2d at 606. Because the restrictions were remedial in nature and thus incidental to the speech, the court determined that the injunction was content-neutral. *Id.* We find that the prohibition on simultaneous picketing by groups with opposing viewpoints in the present case focuses directly upon the impact the speech will have on its audience rather than on the prior misconduct of the speakers. Therefore, we analyze this injunction as content-based.

{¶ 13} Seven Hills sought the prohibition at issue because of the potential for serious problems if two antagonistic groups, such as the KKK and the CJC, demonstrated simultaneously. The primary justification for seeking this portion of the injunction was Seven Hills' fear of a hostile reaction among listeners. The speech restriction in this case is directly related to the speech's impact on listeners rather than being incidental to the purpose. "Listeners' reaction to speech is not a content-neutral basis for regulation." *Forsythe Cty., Georgia v. Nationalist Movement* (1992), 505 U.S. 123, 134, 112 S.Ct. 2395, 2403, 120 L.Ed.2d 101, 114, citing *Boos*, 485 U.S. at 321, 108 S.Ct. at 1163, 99 L.Ed.2d at 344.

{¶ 14} Moreover, the prohibition on counterdemonstration in the present case is not based on the prior misconduct of the parties, as was the content-neutral injunction in *Madsen*. Here, there have been no arrests, no threats of arrest, no violence, no injuries, and no violations of the temporary or preliminary injunctions. To the contrary, the KKK and CJC have engaged only in peaceful picketing. Rather than being a remedial injunction to correct past misconduct, the injunction in this case is prospective, applying to all groups regardless of past conduct.

{¶ 15} This content-based injunction may also be properly characterized as a prior restraint upon speech. See *Northeast Women's Ctr., Inc. v. McMonagle* (C.A. 3, 1991), 939 F.2d 57, 63. "The term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.' M. Nimmer, Nimmer on Freedom of Speech § 4.03, p 4-14 (1984) (emphasis added). ***

[P]ermanent injunctions—i.e., court orders that actually forbid speech activities—are classic examples of prior restraints." *Alexander v. United States* (1993), 509 U.S. ___, ___, 113 S.Ct. 2766, 2771, 125 L.Ed.2d 441, 450.

{¶ 16} Having determined that the injunction in this case is a content-based restriction in a public forum, we now turn to the standard to apply in determining whether it is a constitutionally permissible restriction. We initially note that a prior restraint on speech carries a "'heavy presumption' against its constitutional validity." *Organization for a Better Austin v. Keefe* (1971), 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1, 5; *New York Times Co. v. United States* (1971), 403 U.S. 713, 723, 91 S.Ct. 2140, 2146, 29 L.Ed.2d 822, 830. Content-based restrictions in a public forum are also subjected to the most exacting scrutiny. *Boos*, 485 U.S. at 321, 108 S.Ct. at 1164, 99 L.Ed.2d at 345. To be victorious, Seven Hills must show that the "regulation is necessary to serve a compelling state interest and *** is narrowly drawn to achieve that end." *Perry Edn. Assn.*, 460 U.S. at 45, 103 S.Ct. at 955, 74 L.Ed.2d at 804.

{¶ 17} We first consider whether the restriction advances a compelling government interest. The court of appeals, in applying an intermediate level of scrutiny for content-neutral restrictions, found "beyond question" that Seven Hills demonstrated a "significant government interest" justifying the challenged provisions—the "protection of its citizens by preventing *potentially* dangerous confrontations from occurring in a residential neighborhood." (Emphasis added.) Weiss concedes, as he must, that Seven Hills has a "'strong interest in ensuring public safety and order.'" Nonetheless, he argues that avoiding a *potential* threat to public order through provocative speech is not a compelling government interest. We agree.

{¶ 18} An essential function of free speech is to invite dispute. *Terminiello v. Chicago* (1949), 337 U.S. 1, 4, 69 S.Ct. 894, 896, L.Ed.2d 1131, 1134. Speech may "best serve its high purpose when it induces a condition of unrest, creates

6

dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.* * * [F]reedom of speech, though not absolute, * * * is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Id*.

{¶ 19} The United States Supreme Court has repeatedly affirmed the proposition that speech cannot be prohibited because it risks inciting others to violence unless there is a clear and present danger of imminent violence or lawlessness. See *Schenk v. United States* (1919), 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470, 473-474; *Cantwell v. Connecticut* (1940), 310 U.S. 296, 308, 60 S.Ct. 900, 905, 84 L.Ed. 1213, 1220; *Fed. Communications Comm. v. Pacifica Found.* (1978), 438 U.S. 726, 745, 98 S.Ct. 3026, 3038, 57 L.Ed.2d 1073, 1090. Speech may be suppressed only if it is *both* directed to inciting imminent lawless action and likely to produce such action. *Brandenburg v. Ohio* (1969), 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430, 434; *Texas v. Johnson* (1989), 491 U.S. 397, 409, 109 S.Ct. 2533, 2542, 105 L.Ed.2d 342, 357. Accordingly, avoiding the *potential* for violence is not a compelling government interest.

{¶ 20} Furthermore, evidence presented at the hearing does not support a finding that violence or lawlessness was either likely or imminent. Seven Hills relies on the protestors' reputation for violence and prior violent behavior in Cleveland and Columbus to support a finding of imminent violence in Seven Hills. However, none of the protestors at Seven Hills engaged in violence, threatened violence, was arrested, or violated police or court orders. The Grand Dragon of the Ohio branch of the KKK, the group that actually protested at the Demjanjuk residence, testified, "It would be possible [to protest at the same time] because we can contain ourselves. If they can contain theirselves [sic], that's fine." He further

testified that other branches of the KKK "probably wouldn't become violent unless somebody brought them on to it." Weiss also testified that he was committed to nonviolent protest. Protests between antagonistic groups in other cities actually support the contention that violence was not imminent in Seven Hills -- no arrests were made during the Cleveland incident, nor was the Ohio branch of the KKK involved in the Columbus incident. The evidence presented by Seven Hills lacks the immediacy and specificity necessary to show that violence or lawlessness was likely and imminent.

{¶ 21} Seven Hills also advances the neighborhood residents' interest in privacy, peace and tranquillity, and the city's interest in preserving police resources as compelling. Because society should bear the expense of guaranteeing free speech no matter how offensive, the city's desire to reduce its burden in providing police resources is not a *compelling* government interest. See *Invisible Empire Knights of the KKK v. City of W. Haven* (D.Conn. 1985), 600 F.Supp. 1427, 1434, citing *Wolin v. Port of New York Auth.* (1968), 392 F.2d 83, 94 (individuals exercising First Amendment rights are entitled to police protection).

{¶ 22} The city's interest in protecting the "'well-being, tranquillity, and privacy of the home'" has been recognized as significant. *Frisby*, 487 U.S. at 484, 108 S.Ct. at 2502, 101 L.Ed.2d at 431, quoting *Carey v. Brown* (1980), 447 U.S. 455, 471, 100 S.Ct. 2286, 2296, 65 L.Ed.2d 263, 276. However, *Frisby* limited its consideration to an *individual's* right to privacy and well-being within his own home. The court expressly preserved the right of protesters to march through a residential neighborhood or go door-to-door within the residential neighborhood regardless of the residents' rights to privacy and well-being. *Frisby*, 487 U.S. at 483-484, 108 S.Ct. at 2502, 101 L.Ed.2d at 431.

{¶ 23} Were we, for argument's sake, to assume that Seven Hills' interests were compelling, the restriction would nonetheless have to be narrowly tailored to serve those interests. *Perry Edn. Assn.*, 460 U.S. at 45, 103 S.Ct. at 955, 74 L.Ed.2d

at 804. The record before us does not support a complete ban on the simultaneous expression of contrary views, but rather demonstrates that lesser, more exact restrictions may achieve the city's desired results. For example, Seven Hills' own expert in mob and riot control testified that the Seven Hills police could control the picketers if they were limited in numbers. Because Seven Hills could have achieved its desired results by limiting the number of picketers, the duration of the pickets, or the time of the pickets, we find that the complete prohibition on simultaneous picketing by groups with opposing viewpoints is not narrowly tailored to serve a compelling state interest.

{¶ 24} A trial court abuses its discretion where its decision is clearly erroneous and unreasonable. See *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 10 O.O.3d 332, 383 N.E.2d 564; *Ohio Civ. Rights Comm. v. Case W. Res. Univ.* (1996), 76 Ohio St.3d 168, ___ N.E.2d ___. We hold that in fashioning an injunction limiting picketing in a residential area, a trial court abuses its discretion by completely banning simultaneous picketing by groups expressing contrary views rather than narrowly tailoring the injunction to serve compelling government interests. Accordingly, we reverse the judgment of the court of appeals.

*Judgment reversed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and STRATTON, JJ., concur.

DOUGLAS and STRATTON, JJ., separately concur.

———————————

**DOUGLAS, J., concurring.**

{¶ 25} The purpose of picketing is to confront. This old, respected and legally protected right should not, in any way, be tampered with. So long as there is no actual harm occurring and no clear and present danger to safety, no restriction on the right should be brooked. Accordingly, I concur.

_____

**STRATTON, J., concurring.**

**{¶ 26}** While I absolutely defend the right of free speech, as that right has been the backbone of this country's strength, I am also troubled that the rights of the minority under the First Amendment often are so zealously guarded that the rights of the majority suffer in the balance.

**{¶ 27}** In this case, were the demonstrations on a public street in front of city hall, or a government building, and in an open area containing no private residences, I would have no hesitation to defend the right to confront as part of free speech. However, I am greatly troubled that these demonstrations took place on a narrow, residential street, in a city with a police force ill-suited for dealing with demonstrations of this magnitude. This is a street where cars go to and from work, where children come home from school and where residents live and play. They are being subjected to someone else's exercise of free speech aimed at a party whose issues have nothing to do with their own, in an environment with a potential for violence. Ironically, the residents on the street testified that the major concern to them was the media and their intrusion into the neighbors' private lives. The only near-violent incident was when a neighbor threatened to throw rocks at a cameraman.

**{¶ 28}** However, a careful review of the record convinces me that a clear and present danger did not exist, despite the claims in the briefs and the oral arguments. The statements by Rabbi Weiss and representatives of the Ku Klux Klan, as well as instances of prior confrontation, create a scenario for *possible* violence to occur. The law requires more than a possibility. In testimony, each side stated its intention to abide by the orders of the officers and its desire to demonstrate peaceably. No indication of problems or violence had yet arisen. Under these conditions, the law allows such a right of confrontation for purposes of free speech.

**{¶ 29}** While the remedy fashioned by the court seems reasonable for the safety and protection of the residents of the street, the status of the law, wisely or not, appears to more zealously guard the rights of demonstrators to exercise their free speech than the rights of others to peaceably enjoy their homes. It is both a strength and a weakness of our system. Therefore, I reluctantly concur in the conclusions of the majority.

––––––––––––––––––