STATE of Wisconsin, Plaintiff-Respondent,

v.

Robert C. BRAUN, Defendant-Appellant.

Court of Appeals

*Nos. 88-1065-CR, 88-2049-CR. Submitted on briefs August 1, 1989.—Decided September 26, 1989.*

(Also reported in 449 N.W.2d 851.)

For the plaintiff-respondent the cause was submitted on the briefs of *Jeffrey A. Kremers* of counsel, of Milwaukee.

For the defendant-appellant the cause was submitted on the briefs of *Richard D. Martin* of counsel, of Milwaukee.

Before Moser, P.J., Sullivan and Fine, JJ.

FINE, J.   This case concerns the authority of a special prosecutor appointed under sec. 59.44(1), Stats., and the reach of a trial court's discretion to set conditions of bail when those conditions implicate First Amendment rights.

## I.

On May 10, 1986, Robert C. Braun and a number of other abortion-protestors were arrested at the Milwaukee Health Clinic on West State Street in Milwaukee. Anticipating that the police would seek to have them charged with criminal trespass to a medical facility under the then recently-adopted sec. 943.145, Stats., the Milwaukee County District Attorney's office requested the appointment of a special prosecutor under sec. 59.44(1), Stats., which permits the appointment when the district attorney "is unable to attend to his duties."[1] As expressed in the district attorney's affidavit submitted to the chief judge of the Circuit Court for District I, the district attorney had "publicly expressed opposition

---

[1] Section 59.44(1), Stats., provides:

> When there is no district attorney for the county, or he is absent from the county, or has acted as counsel or attorney for a party accused in relation to the matter of which the accused stands charged and for which he is to be tried, or is near of kin to the party to be tried on a criminal charge, or is unable to attend to his duties, or is serving in the armed forces of the United States, or if the district attorney stands charged with a crime and the governor has not acted under s. 17.11, any judge of a court of record, by an order entered in the record stating the cause therefor, may appoint some suitable person to perform, for the time being, or for the trial of such accused person, the duties of such district attorney, and the person so appointed shall have all the powers of the district attorney while so acting.

to some law changes in years past on the issue of abortion" and believed that he would not be "able to attend to his duties as they bear upon the initial interpretation of this new statute in a manner most consistent with the broadest interpretation of Supreme Court Rule 20.48(6) (1986), and at the same time avoid 'the appearance of impropriety.'" [2] On May 12, 1986, the chief judge granted the request and entered the following order:

> That Attorney Jeffrey Kremers is appointed to act as District Attorney to determine what, if any, charges should be issued against those individuals arrested at Milwaukee Health Clinic at 1124 West State Street, Milwaukee, Wisconsin, on May 10, 1986, and to prosecute such charges as may be issued.

Special Prosecutor Kremers charged Braun and two others with having committed criminal trespass to a medical facility on May 10, 1986, in violation of sec. 943.145, Stats. Braun was acquitted of the trespass charge on March 3, 1988.

---

[2] Supreme Court Rule 20.48(6) (1986) of the Code of Professional Responsibility provided:

**(6)  Ethical Consideration.** Every lawyer owes a solemn duty to uphold the integrity and honor of his or her profession; to encourage respect for the law and for the courts and the judges thereof; to observe the code of professional responsibility; to act as a member of a learned profession, one dedicated to public service; to cooperate with his or her brother or sister lawyers in supporting the organized bar through the devoting of his or her time, efforts and financial support as his or her professional standing and ability reasonably permit; to conduct himself or herself so as to reflect credit on the legal profession and to inspire the confidence, respect and trust of his or her clients and of the public; and to strive to avoid not only professional impropriety but also the appearance of impropriety.

The rule was superceded by the adoption of the Rules of Professional Conduct for Attorneys, effective January 1, 1988. 139 Wis. 2d xv.

Braun made his initial appearance on the trespass-to-a-medical-facility charge on May 16, 1986, and was released on a $500 personal recognizance bond. On May 21, he entered a not-guilty plea, and, as a condition of his bond, was ordered to have "no contact" with the Milwaukee Health Clinic. This condition was expanded on October 13, 1986, when the trial court instructed Braun, at the special prosecutor's request, that "no contact" "means no contact, no going inside the facility, no phone calls to the facility and not to be within 500 feet of that facility."[3]

On November 17, 1986, the special prosecutor signed a criminal complaint that charged Braun with bail jumping, in violation of sec. 946.49(1)(a), Stats.[4] The criminal complaint alleged that two days earlier, on November 15, the complaining officer "was right outside" the facility at 1124 West State Street and saw

---

[3] Braun made his initial appearance before the Honorable Patricia D. McMahon. Judge McMahon set the conditions of bail at issue here, and identified the "facility" as "the Women's Health Organization" at "1124 West State Street." As seen, the chief judge's order of appointment authorized the special prosecutor to issue charges in connection with the May 10, 1986, incident at the "Milwaukee Health Clinic" at that address. The parties do not contend that these are two different facilities or that this is an issue here. There was trial testimony that there was only one entity at the 1124 West State Street address. For ease of reference, and to be consistent with the terminology used in the chief judge's order of appointment, we will refer to the facility at 1124 West State Street as the Milwaukee Health Clinic.

[4] Section 946.49(1)(a), Stats., provides:

(1) Whoever, having been released from custody under ch. 969, intentionally fails to comply with the terms of his or her bond is:

(a) If the offense with which the person is charged is a misdemeanor, guilty of a Class A misdemeanor.

Braun "picketing" and, additionally, saw Braun "walk up to an area within 25 feet" of the facility.

At the trial on the bail-jumping charge, one of the police officers who arrested Braun testified that he was dispatched to 1124 West State Street on November 15, 1986, and that, when he arrived on the scene, he saw Braun talking to some television news reporters "approximately fifteen to twenty feet away from the building." The officer described what happened next:

> After they took some pictures of him, he produced a sign, walked across the street from the clinic, and walked back and forth across the street on the south side of the street. He walked up to the corner of 12th Street and then walked back. He was shouting a name of the operator of the clinic, . . . and flashing the sign toward the clinic . . . . [Then], Mr. Braun walked directly toward the clinic across State Street in a northerly direction. As he did that, I approached him. We met on the sidewalk at approximately the east corner of the building. We're still on the sidewalk, and I asked him if he was out on any type of bail.

The officer estimated that when he approached Braun, Braun was fifteen to twenty feet from the clinic. Braun was then arrested. In response to cross-examination questions asked by Braun acting pro se, the officer testified that Braun was picketing in front of the building where Planned Parenthood is located, across the street from the Milwaukee Health Clinic, and not in front of the clinic itself. The officer also testified that State Street in that vicinity was approximately fifty feet wide. He estimated that approximately five minutes had passed from the time he first saw Braun to the time of the arrest.

505

Braun testified that he was picketing Planned Parenthood on November 15, and that he had tried to stay "as far away from the clinic as I could." He denied he intentionally violated the condition of his bond.

Braun was convicted by a jury of bail jumping and was sentenced to a thirty-day term in the Milwaukee County House of Correction during his non-working hours under the provisions of the "Huber Law," sec. 56.08(1), Stats.[5] We reverse.

## II.

The duties and authority of the district attorney in Wisconsin are set by statute. Sec. 59.47, Stats. *See also State v. Unnamed Defendant,* 150 Wis. 2d 352, 364, 441 N.W.2d 696, 700–701 (1989) (filing of criminal complaint "was probably exclusively a judicial responsibility" prior to the adoption, in 1945, of statute authorizing the district attorney to commence criminal proceedings).[6] The role of persons appointed to temporarily perform the duties of the district attorney is similarly limited by the statute authorizing their appointment.

---

[5] Braun was tried on the bail-jumping charge before the Honorable William D. Gardner. Judge Gardner imposed sentence. The Honorable Joseph P. Callan entered judgment and denied Braun's post-conviction motion.

[6] There is scholarly support for the view that the district attorney's powers and duties may not, however, be reduced below those attending the office at common law or under the territorial statutes in force at the time the Wisconsin Constitution was adopted. Becker, *Judicial Scrutiny of Prosecutorial Discretion in the Decision Not to File a Complaint,* 71 Marq. L. Rev. 749, 758–762 (1988). The constitution, however, merely recognizes the office and establishes the duration of its term. Wis. Const. art. VI, sec. 4(1).

Section 59.44(1), Stats., subjects those appointed as special prosecutor under that subsection to the terms and conditions of the order of appointment:

> When . . . [the district attorney] is unable to attend to his duties, . . . any judge of a court of record, by an order entered in the record stating the cause therefor, may appoint some suitable person to perform, *for the time being,* . . . the duties of such district attorney, and the person so appointed shall have all the powers of the district attorney while so acting.

Sec. 59.44(1), Stats. (emphasis added). The special prosecutor argues that the order of appointment authorized his prosecution of Braun for bail jumping because Braun was one of those arrested on May 10, 1986, and the conditions of Braun's bail were set in connection with the May 10 incident. The order of appointment, however, is more narrowly focussed. As seen, it authorized the special prosecutor "to determine what, if any, charges should be issued against those individuals arrested at Milwaukee Health Clinic at 1124 West State Street, Milwaukee, Wisconsin, on May 10, 1986, and to prosecute such charges as may be issued." In essence, the "time being" for which the special prosecutor was invested with "all the powers of the district attorney," sec. 59.44(1), Stats., was limited to the tasks specified in the order.

The order appointing the special prosecutor could have been written to encompass the powers he assumed. The affidavits executed by the district attorney and a deputy district attorney, and submitted in support of the order, reveal why it was not.[7] Those affidavits empha-

---

[7] The affidavits were referenced by the order of appointment in compliance with the statutory requirement that the order "state[ ] the cause therefor," sec. 59.44(1), Stats.

sized that sec. 943.145, Stats., had been recently enacted, and asserted that the order was sought because the district attorney believed that ethical constraints prevented him or his office from attending to their "duties as they bear upon the *initial interpretation* of this new statute." [Emphasis added.] Prosecution for bail jumping, however, does not involve "the initial interpretation" of sec. 943.145, even though the conditions of the bond were set in the underlying prosecution for the alleged violation of its provisions.

The special prosecutor was initially unsure whether he had authority to charge and prosecute Braun for bail jumping. That is why, as he explained to the trial court, he asked the deputy chief judge of the District I circuit court for guidance. In response to that inquiry, the deputy chief judge advised the special prosecutor that the bail jumping matter was within the ambit of his authority. The trial court interpreted the deputy chief judge's oral comments "as an addendum to [the special prosecutor's] appointment for the underlying trespass charge."

Section 59.44(1), Stats., requires that any order of appointment be "entered in the record." Assuming, without deciding, that such an order could be oral, if reported on the record, the special prosecutor's conversation with the deputy chief judge did not culminate in *any* "order," written *or* oral, that was "entered in the record." As it was noted by the Wisconsin Supreme Court almost a century ago, construing substantially similar language ("by an order, to be entered in the minutes"), a "communication of the circuit judge cannot take the place of an order of the court entered on its minutes." *Williams v. Dodge County,* 95 Wis. 604, 606, 70 N.W. 821 (1897).

In sum, the special prosecutor's order of appointment invested him with "all the powers of the district attorney" for a limited purpose—namely, the prosecution of Braun and the others under sec. 943.145, Stats., as a result of their arrest on May 10, 1986. Since the special prosecutor had no authority to venture beyond that mandate, Braun's conviction must be vacated. [8]

### III.

### A.

Under ordinary circumstances, our conclusion that the special prosecutor exceeded the authority granted to him by the order of appointment would end our consideration of this case. There is, however, a significant First Amendment issue raised by the conditions of bail.

First Amendment "freedoms are delicate and vulnerable, as well as supremely precious in our society . . . [, and they] need breathing space to survive." *N.A.A.C.P. v. Button,* 371 U.S. 415, 433 (1963) (citations omitted). The First Amendment issue was presented to the trial court and has been thoroughly briefed here. Failure to address that issue would constrict the First Amendment's needed "breathing space" by permitting similar conditions to be imposed in future cases. *Cf. Mueller v. Jensen,* 63 Wis. 2d 362, 366–367, 217 N.W.2d 277, 279 (1974) ("[A]n appellate court may retain an appeal for determination if it involves questions of public interest

---

[8] Neither Braun nor the state has argued whether the *de facto* officer doctrine, *see Walberg v. State,* 73 Wis. 2d 448, 463–464, 243 N.W.2d 190, 198 (1976), precludes Braun from challenging the scope of Kremers' authority, *see Fenelon v. Butts,* 49 Wis. 342, 347, 5 N.W. 784, 786 (1880), and we express no view on that issue.

even though it has become moot as to the particular parties involved."); *State ex rel. Jackson v. Coffey,* 18 Wis. 2d 529, 533, 118 N.W.2d 939, 942 (1963) (issues briefed may be considered if likely to recur on remand even though other issues are dispositive of appeal).

An analogous situation was recently presented in *Massachusetts v. Oakes,* 491 U.S. —, 109 S. Ct. 2633 (1989). Oakes was convicted of violating a statute that, in effect, prohibited adults from taking nude pictures of minors. Oakes took pictures of his "partially nude and physically mature 14-year-old stepdaughter." *Id.,* 109 S. Ct. at 2636. His conviction was overturned by the Supreme Judicial Court of Massachusetts, which did not consider whether the statute could be constitutionally applied to Oakes' conduct. Rather, it concluded that the statute was overbroad because it would "criminalize conduct that virtually every person would regard as lawful," such as frontal-view photographs taken by a parent of "his or her naked one-year old running on a beach or romping in a wading pool." *Id.,* 109 S. Ct. at 2636–2637 (quoting 518 N.E.2d 836, 838 [Mass. 1988]). Subsequently, the statute was amended to add a "lascivious intent" requirement. *Id.,* 109 S. Ct. at 2638 n. 2.

After pointing out that "[t]he First Amendment doctrine of substantial overbreadth is an exception to the general rule that a person to whom a statute may be constitutionally applied cannot challenge the statute on the ground that it may be unconstitutionally applied to others" because there is "the danger that an overly broad statute, if left in place, may cause persons whose expression is constitutionally protected to refrain from exercising their rights for fear of criminal sanctions," *Id.,* 109 S. Ct. at 2637, the Supreme Court, by plurality opinion, vacated the decision of the Supreme Judicial Court of Massachusetts on the ground that an "overbreadth anal-

ysis is inappropriate if the statute being challenged has been amended or repealed." *Ibid.* Justice Antonin Scalia, writing separately for five members of the Court, demurred:

> The overbreadth doctrine serves to protect constitutionally legitimate speech not merely *ex post,* that is, after the offending statute is enacted, but also *ex ante,* that is, when the legislature is contemplating what sort of statute to enact. If the promulgation of overbroad laws affecting speech was cost free, as the plurality's new doctrine would make it—that is, if *no* conviction of constitutionally proscribable conduct would be lost, so long as the offending statute was narrowed before the final appeal—then legislatures would have significantly reduced incentive to stay within constitutional bounds in the first place. When one takes account of those overbroad statutes that are never challenged, and of the time that elapses before the ones that are challenged are amended to come within constitutional bounds, a substantial amount of legitimate speech would be "chilled" as a consequence of the rule the plurality would adopt.

*Id.* at 2639–2640 (Scalia, J., concurring in the judgment in part and dissenting in part) (emphasis in original). The same rationale applies here. It is important that we consider the First Amendment aspects of this case so that, in Justice Scalia's words, "a substantial amount of legitimate speech [not] be 'chilled.' "

### B.

Persons released on bail are subject to a number of conditions that are generally left to the trial court's discretion. *See* sec. 969.02, Stats. (persons charged with misdemeanors); sec. 969.03, Stats. (persons charged with

felonies); *State v. Gassen,* 143 Wis. 2d 761, 765, 422 N.W.2d 863, 864 (Ct. App. 1988). In addition to specifically designated restrictions, such as, for example, those on a defendant's "travel, association or place of abode," secs. 969.02(3)(b) and 969.03(1)(b), Stats., the trial court may also "[i]mpose any other condition deemed reasonably necessary to assure appearance as required or any nonmonetary condition deemed reasonably necessary to protect members of the community from serious bodily harm or prevent intimidation of witnesses . . .." Secs. 969.02(3)(d) and 969.03(1)(e), Stats. *See also* sec. 969.01(4), Stats. ("Conditions of release, other than monetary conditions, may be imposed for the purpose of protecting members of the community from serious bodily harm or preventing intimidation of witnesses.").

Braun was charged with trespass to a medical facility, a misdemeanor. Sec. 943.145(2), Stats. An initial condition of bail was that he and the other defendants have "no contact with the medical facility." Some five months later, additional conditions were set at the special prosecutor's request. The special prosecutor told the trial court that he was concerned by "the activity of a couple of the defendants who have picketed outside the clinic on public sidewalks but clearly right in front of at least one of the clinics involved," even though none of the defendants had violated the "no contact" condition of bail by "going into a clinic and walking into a waiting room." Seeking guidance as to what was encompassed by the "no contact" order, the special prosecutor asked that the trial court give "some indication as to how extensive that ["no contact"] condition of bail is meant to be." The special prosecutor suggested, by analogy to harassment and domestic abuse cases, that a 500-foot limitation be imposed. Counsel representing one of the defendants objected to this as raising "certain constitutional

problems," and argued that the defendants should "still be permitted to exercise fundamental First Amendment rights of picketing on the sidewalk where the rights are most protected." The trial court adopted the special prosecutor's suggestion and imposed the 500-foot restriction on the defendants, including Braun. The trial court's rationale was expressed in the following brief statement:

> The Court sets bail to insure the appearance of the defendants and may also set conditions to protect society. One of the reasons is to prevent any likelihood of intimidation of witnesses is a valid interest of the State. [*Sic*]

1.

It is paradigm that "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity," *N.A.A.C.P.,* 371 U.S. at 433, and "[t]here is no doubt that as a general matter peaceful picketing and leafletting are expressive activities involving 'speech' protected by the First Amendment." *United States v. Grace,* 461 U.S. 171, 176 (1983). Where there is "a *content-based* restriction on *political speech* in a *public forum*" the regulation is "subjected to the most exacting scrutiny," and any regulation must be " 'necessary to serve a compelling state interest and [be] narrowly drawn to achieve that end.' " *Boos v. Barry,* 485 U.S. —, 108 S. Ct. 1157, 1164 (1988) (striking down a statute insofar as it prohibited picketing within 500 feet of buildings used or occupied by foreign governments if the picketing was critical of a foreign government, organization, or official) (emphasis in original) (quoting *Perry Education Ass'n v. Perry Local Educators Ass'n,* 460 U.S. 37, 45 [1983]).

In imposing the 500-foot restriction, the trial court was aware that Braun sought to engage in content-based political speech by protesting abortion. Nevertheless, the trial court's order prohibited Braun from expressing those views on a public street, "the archetype of a traditional public forum," *Frisby v. Schultz,* 487 U.S. —, 108 S. Ct. 2495, 2499 (1988), even though it made no findings that the 500-foot restriction was a condition necessary to either protect "members of the community from serious bodily harm" or to prevent "intimidation of witnesses," *see* secs. 969.01(4) and 969.02(3)(d), Stats., or that it served any other compelling governmental interest. Indeed, the appellate record is devoid of *any* evidence that would support a restriction of that breadth. Thus, the 500-foot restriction violated secs. 969.01(4) and 969.02(3)(d), Stats., as well as Braun's right to free speech. *Cf. Grace,* 461 U.S. at 182 (right to picket on the sidewalk in front of the United States Supreme Court upheld in absence of evidence that the picketing "obstructed the sidewalks or access to the building, threatened injury to any person or property, or . . . interfered with the orderly administration of the building . . .."); *United States ex rel. Means v. Solem,* 440 F. Supp. 544, 549–552 (D. S.D. 1977) (bail condition that defendant refrain from most activities in the American Indian Movement organization violated his First Amendment right of free speech and free association).

2.

The special prosecutor has contended, as expressed before the trial court, that Braun's status as an accused defendant released on bail permitted the restriction:

> I think they have given up, by virtue of the fact they are now charged with a crime, they have given up some of their rights as to where and when they can express all of their First Amendment rights.

We disagree.

We reject the view that a person charged with a crime, but not convicted, forfeits his or her First Amendment rights. Indeed, though a prison regulation may impinge upon an inmate's constitutional rights if it "is reasonably related to legitimate penological interests," *Turner v. Safley,* 482 U.S. 78, 89 (1987), even "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Id.* at 84. Here there were no prison walls encircling those proven guilty—merely conditions of release, imposed upon those presumed to be innocent.

### 3.

There may, of course, be circumstances where some First Amendment restrictions might be appropriate, if necessary to protect victims, witnesses, or other members of the community. *See* secs. 969.01(4), 969.02(3)(d), and 969.03(1)(e), Stats.; *Frisby,* 108 S. Ct. at 2499–2504 (upholding narrowly drawn ordinance that restricted picketing in residential areas); *Boos,* 108 S. Ct. at 1168–1169 (upholding statute, judicially narrowed to apply only to "groups posing a security threat," that prohibited congregation in front of any foreign embassy, legation, or consulate after direction to disperse); *cf. Grace,* 461 U.S. at 182 (sidewalks in front of Supreme Court building subject to reasonable time, place and manner restrictions, but absent obstruction, threatened injury to person or property, or interference with administration of the building, complete picketing ban

rejected). No special circumstances justifying the extraordinary interference with Braun's right to free speech were shown in this case.

*By the Court.*—Judgment vacated and order reversed.