[This opinion has been published in *Ohio Official Reports* at 85 Ohio St.3d 465.]

EAST CANTON EDUCATION ASSOCIATION ET AL., APPELLANTS, *v*. MCINTOSH, APPELLEE; OSNABURG LOCAL SCHOOL DISTRICT BOARD OF EDUCATION ET AL., APPELLANTS.

THE STATE EX REL. MCINTOSH, APPELLEE, *v*. OSNABURG LOCAL SCHOOL DISTRICT BOARD OF EDUCATION ET AL., APPELLANTS.

[Cite as *E. Canton Edn. Assn. v. McIntosh*, 1999-Ohio-282.]

*Schools—Teachers—Attainment of continuing service status by an eligible teacher is not dependent upon a written contract of employment between teacher and board of education—R.C. 3319.08 and 3319.11(B), construed—Torts—Defamation—Public school principal is not a public official for purposes of defamation law.*

1.      The attainment of continuing service status by an eligible teacher is not dependent upon a written contract of employment between the teacher and a board of education.  If, after a teacher attains continuing service status, the board adopts a motion or resolution to employ the teacher under a continuing contract of employment, the teacher will be considered to be employed and serving under a continuing contract of employment.  (R.C. 3319.08 and 3319.11[B], construed.)

2.      A public school principal is not a public official for purposes of defamation law.

(Nos. 97-2039 and 98-834—Submitted January 12, 1999—Decided May 19, 1999.)

APPEAL from the Court of Appeals for Stark County, No. 96-CA-0293.

APPEAL from the Court of Appeals for Stark County, Nos. 97-CA-50, 97-CA-56 and 97-CA-60.

————————————

{¶ 1} These appeals arise from complex, convoluted, and questionable procedures. Nevertheless, the precise procedural details of each case are largely irrelevant. We accepted jurisdiction and consolidated the cases to consider (1) whether appellee John R. McIntosh had attained continuing service status as a teacher with the Marlington Local School Board of Education ("Marlington"), and (2) whether the Fifth Appellate District correctly concluded in its decisions that McIntosh was neither a public official nor a public figure for purposes of his defamation claims.[1] The supporting facts and procedural postures of the cases relevant to a proper determination of these issues are as follows.

{¶ 2} Beginning in 1966, McIntosh was hired by Marlington as a seventh grade social studies teacher under a limited contract of employment. From the 1971-1972 through the 1975-1976 school years, McIntosh was assigned guidance counselor duties, and he also performed some teaching functions in the district. On April 8, 1975, Marlington voted to grant McIntosh a continuing contract of employment. McIntosh does not recall if a written contract was ever entered into. In June 1975, McIntosh accepted an administrative position as an assistant principal with Marlington. From the 1975-1976 through the 1980-1981 school years, McIntosh was employed by Marlington as an assistant principal, and, from the 1981-1982 through the 1986-1987 school years, he served as a principal in the district.

{¶ 3} Following his employment with Marlington, McIntosh was hired by appellant Osnaburg Local School Board of Education ("Osnaburg" or "board"). From the 1987-1988 through the 1989-1990 school years, McIntosh was employed by Osnaburg as the East Canton High School assistant principal, and, from the

_____

1. The appellants in these consolidated cases have set forth additional issues for our consideration. However, our holdings today are specifically confined to the issues considered, and we make no comment regarding the merits of any other issues addressed by the courts below or raised by the parties on appeal in this court.

1990-1991 through the 1994-1995 school years, he served as the high school principal.

{¶ 4} In February 1995, McIntosh met with Osnaburg to discuss his employment status for the coming school year. The board informed him that it intended not to renew his administrative contract, which was set to expire on July 31, 1995. The board proposed to McIntosh that he resign his position as principal and that he could become an employee of the Stark County Department of Education. McIntosh refused to resign. He advised the board that he was a tenured teacher and that he was entitled to reemployment within the district.

{¶ 5} In March 1995, Osnaburg notified McIntosh of its intention not to reemploy him. Students became aware of the board's intentions, and some began wearing "Keep Mac" ribbons. The media also became involved. On March 9, 1995, appellant Dr. George McGuire, the school superintendent, in the presence of two police officers, ordered McIntosh to vacate the school building, and he was placed on home assignment. McGuire warned McIntosh that if he returned to the school, he would be considered a trespasser and that appropriate action would be taken against him. Numerous students showed further support for McIntosh by not reporting to school, by leaving school during school hours, and by making signs. Some students held demonstrations outside the school building.

{¶ 6} In a letter dated March 10, 1995, McGuire informed McIntosh that he (McGuire) was going to recommend to the board that McIntosh's "teaching/administrative contract(s) with the District be suspended and/or terminated" for, among other things, "gross inefficiency," "immorality," "willful and persistent violations of reasonable regulations of the Board of Education," "ineffectiveness in maintaining appropriate student discipline," "student safety," and "condoning and/or promoting student unrest." McIntosh was also advised that he could appear before the board on March 13, 1995 "to show cause why your contract(s) should not be suspended and/or terminated."

**{¶ 7}** Additionally, on March 10, 1995, appellant Sharon E. Griffith met with members of appellant East Canton Education Association ("ECEA"). Griffith was president of ECEA. According to Griffith, ECEA members voted at the March 10 meeting "to issue a public statement addressing McIntosh's actions." The "public statement" was written by appellant Mary Jo Slick, a labor relations consultant for appellant Ohio Education Association ("OEA"), and it was read by Griffith at the March 13, 1995 board meeting.[2]

---

2. The statement written by Slick and read by Griffith at the March 13, 1995 board meeting provides:

"My name is Sharon Griffith and I am President of the East Canton Educators' [*sic*] Association. I am here tonight specifically authorized by our membership to address you on their behalf and to express their views on the recent events in our district. In fact, the vote of our teachers was overwhelming—only 4 no votes from the entire staff.

"It is with great sadness that the staff here tonight felt it necessary to take the unusual step of publicly entering this debate. *Let there be no doubt, the ECEA supports the recommendation of the Superintendent and urges this Board to do the same.*

"This issue never was, and should not have become, one that was personalized around one individual. Mr. McIntosh IS NOT the issue here tonight. Rather, the issue is whether or not representative democracy is alive and well in this district or shall we be governed hereafter by mob rule.

"The people here tonight DO NOT represent the East Canton community. They can only represent themselves. While they are certainly entitled to their opinions, they are elected by no one and accountable to no one. On the other hand, this Board was elected by the entire community and is accountable at the ballot box. That is the democratic process that has made this country great and protected the silent majority from small vocal self-interest groups such as those here tonight.

"The proper function of any school board is to develop a philosophy of education that will guide the district and then to hire the very best Superintendent to lead the school team. As in any team undertaking, there can only be one leader—one quarterback. Otherwise, what you have is chaos. This Board has selected its leader—Dr. McGuire.

"Who in this room tonight is trained, experienced and authorized by law to evaluate John McIntosh? Only Dr. McGuire. Who in this room tonight knows ALL the facts and circumstances surrounding the performance of this principal, not just what he has chosen to share? Dr. McGuire and the Board. On what basis could the group of people here tonight possibly substitute their judgment for that of the Superintendent and the Board? If the Board surrenders to making personnel decisions to those who show up and yell the loudest, they and this community can plan on this type of disruptive spectacle at every Board meeting. And worst of all, what type of lessons are we teaching our children about respect for authority and process?

"As I said a minute ago, this issue should never have been personalized. However, Mr. McIntosh has chosen to do so. When discussing the Board's charge that he had problems with disciplining students, he was quoted in the newspaper as blaming 'weak teachers.' I have personally reviewed every evaluation of each high school teacher. There is not one criticism of any of the teachers, by Mr. McIntosh or any other evaluator, regarding student discipline.

{¶ 8} At the March 13 meeting, the board voted to suspend McIntosh and not to reemploy him at the expiration of his administrative contract. Thereafter, the board held another meeting and, ultimately, did not renew McIntosh's administrative contract. The board concluded that he did not have a right to employment as a teacher in the school district. Events surrounding McIntosh's nonrenewal received considerable media attention.

{¶ 9} On March 17, 1995, McIntosh filed a complaint in the Stark County Court of Common Pleas (case No. 1995-CV-475), naming, as defendants, Osnaburg, the individual members of the board, and McGuire. McIntosh sought a declaratory judgment, a writ of mandamus, an injunction, and monetary damages. McIntosh alleged that he was a tenured teacher, that he should be afforded all rights and privileges pertaining to that status, and that he was entitled to continuing service status as a teacher with Osnaburg. McIntosh also advanced, among other claims, allegations of defamation. Specifically, McIntosh alleged that the charge

---

"For Mr. McIntosh to attempt to blame our high school staff for his alleged inadequacies is unconscionable. The major job of a principal should be to properly and fairly evaluate teachers. If the staff in this district was 'weak in discipline', it was Mr. McIntosh's job to evaluate, record and deal with the problem. He either failed to do so, or was less than honest when he made his statement to the press. *How could this Board or community ever expect our staff to work for Mr. McIntosh as their supervisor or even with him as a fellow teacher after such a self-serving attack?*

"There are laws in this State that provide Mr. McIntosh or any school employee with certain due process rights. The Association supports such a procedure. If, in fact, he has truly been treated unfairly or illegally, why then did Mr. McIntosh not use the proper process? It is just plain wrong for one person to exploit students and to allow a community to be torn apart with the circus-like atmosphere that has existed in this district.

"Tonight it is this Board of Education that will be the teacher. By your actions and decisions what shall you teach us? Shall this community, staff and students learn from you that protest signs, name-calling, manipulation of the media and students, and angry crowds shall define the decision-making process for the Osnaburg Local School District.

"Rather, the professional staff of the East Canton School District hopes that the lesson we learn from you tonight is that in a civilized society, the silent majority, representative democracy, accountability, and the proper process are important. We owe our children no less. Please support the process—please allow this Superintendent to do the job for which you hired him." (Emphasis *sic*.)

of immorality and other statements made by McGuire and ratified by the board and its members were false and actionable.

{¶ 10} On December 22, 1995, ECEA filed a declaratory judgment action in the trial court (case No. 1995-CV-2208-1), seeking a determination that McIntosh had not attained continuing service status with Marlington. ECEA also requested, in the alternative, that if the court should find that McIntosh had attained tenure status with Marlington, then he should not be allowed to displace or cause the layoff of any member of ECEA in the Osnaburg school district. By amended complaint, the board was also made a party defendant in the case.

{¶ 11} On February 9, 1996, McIntosh responded to ECEA's declaratory judgment action. He filed an answer and a counterclaim against ECEA and a third-party complaint against Slick, Griffith, and OEA. McIntosh's third-party complaint against Slick and Griffith was brought against them in both their individual and representative capacities. In his counterclaim and third-party complaint, McIntosh advanced various causes of action, including claims for defamation. His defamation claims were predicated on passages contained in the statement prepared by Slick and read by Giffith at the March 13, 1995 board meeting.

{¶ 12} On August 22, 1996, Judge James S. Gwin, the trial judge assigned to case No. 1995-CV-2208-1, granted summary judgment in favor of ECEA, Slick, Griffith, and OEA, regarding all actions brought by McIntosh in his counterclaim and third-party complaint. With respect to McIntosh's defamation claims, Judge Gwin held that Slick and Griffith were not personally liable to McIntosh for any actions taken by them on behalf of the associations they represented, that McIntosh was a public figure, and that the statement prepared by Slick and read by Griffith at the March 13, 1995 board meeting did not contain defamatory language.

{¶ 13} On appeal, a panel of judges from the Ninth Appellate District sitting by assignment in the Fifth District Court of Appeals (case No. 96-CA-293) reversed the judgment of the trial court in part and affirmed it in part, and remanded the

6

cause for further proceedings. The court held, *inter alia*, that McIntosh was neither a public official nor a public figure and that genuine issues of material fact existed as to whether certain passages contained in the statement read by Griffith at the March 13, 1995 board meeting were defamatory.

{¶ 14} ECEA's declaratory judgment action, case No. 1995-CV-2208-1, had been consolidated with McIntosh's complaint, case No. 1995-CV-475. (ECEA became a party in case No. 1995-CV-475 upon the consolidation of the cases.) Subsequently, on January 23, 1997, Judge John F. Boggins, the trial judge assigned to case No. 1995-CV-475, decided all the claims remaining in both cases and issued two judgment entries. In one entry, Judge Boggins concluded that McIntosh had attained continuing service status as a teacher with Marlington and that he was entitled to employment as a teacher in the Osnaburg school district. With respect to McIntosh's other claims, including the claims for defamation, Judge Boggins, in the other entry, granted summary judgment in favor of the board, its members, and McGuire.

{¶ 15} On appeal, a panel of judges from the Seventh Appellate District sitting by assignment in the Fifth District Court of Appeals (case Nos. 97-CA-50, 97-CA-56 and 97-CA-60) affirmed the judgment of the trial court in part, modified it in part, reversed it in part, and remanded the cause for further proceedings. The court held that McIntosh had attained continuing service status with Marlington, that his tenure rights transferred from Marlington to Osnaburg, and that McIntosh was entitled to employment as a teacher in the Osnaburg school district. The court also determined, among other things, that the trial court erred in dismissing McIntosh's defamation claims against the board, its members, and McGuire.

{¶ 16} Each cause is now before this court upon the allowance of a discretionary appeal.

———————————

*Green, Haines, Sgambati, Murphy & Macala Co., L.P.A.*, and *Ronald G. Macala*, for appellants East Canton Education Association, Ohio Education Association, Mary Jo Slick, and Sharon Griffith in case Nos. 97-2039 and 98-834.

*Brian L. Zimmerman; Allen Schulman & Associates Co., L.P.A.*, *Allen Schulman, Jr.,* and *Christopher J. Van Blargan*, for appellee McIntosh in case Nos. 97-2039 and 98-834.

*Michael J. Spetrino; Means, Bichimer, Burkholder & Baker Co., L.P.A.*, and *Richard W. Ross*, for appellants Osnaburg Local School Board of Education, and members of the board David D. Haubert, Phil A. Bushey, Francis Aquino, Betsy Ketchum, Reed C. Varian, and George McGuire, Superintendent of Osnaburg Local School District, in case Nos. 97-2039 and 98-834.

_____

**DOUGLAS, J.**

I

**{¶ 17}** ECEA, McIntosh, and the board filed stipulations with the trial court in case No. 1995-CV-2208-1. In paragraph five they agreed that "[a]t its regular meeting of April 8, 1975, the Marlington Local School District Board of Education voted to grant Defendant McIntosh a continuing contract of employment." In paragraph six they stated further that "[a]lthough the Marlington Local School District Board of Education took such action at its April 8, 1975 meeting, Defendant McIntosh has no recollection that a continuing contract of employment was ever physically issued to, or executed by him."

**{¶ 18}** ECEA correctly states that if McIntosh had attained continuing contract status as a teacher with Marlington in 1975, then he would be "entitled to a continuing contract [as a teacher] upon the non-renewal of his subsequent administrative employment" with Osnaburg. This conclusion is supported by R.C. 3319.11(B), which provides that "[t]eachers eligible for continuing service status in any * * * school district shall be those teachers qualified as described in division

8

(B)(1) or (2) of section 3319.08 of the Revised Code, who within the last five years have taught for at least three years in the district, and those teachers who *having attained continuing contract status elsewhere*, have served two years in the district * * *." (Emphasis added.) Moreover, in *State ex rel. Kelley v. Clearcreek Local School Dist. Bd. of Edn.* (1990), 52 Ohio St.3d 93, 556 N.E.2d 173, this court held that "[a] certified teacher who has attained continuing service status in one school district, and who has served at least two years as an administrator in a second school district, is entitled to a continuing service contract as a teacher in the second school district if the administrative contract is not renewed." *Id.* at syllabus.

{¶ 19} ECEA contends, however, that Osnaburg was justified in not reemploying McIntosh as a teacher in the district because McIntosh failed to establish that he actually attained continuing service status with Marlington. ECEA points out that the record does not contain a written continuing contract of employment between McIntosh and Marlington. Therefore, according to ECEA, in order to establish that he is entitled to continuing service status as a teacher with Osnaburg, McIntosh was required to comply with R.C. 3319.08, which he failed to do.

{¶ 20} R.C. 3319.08 states that "[t]he board of education of each * * * school district * * * *shall enter into written contracts for the employment and reemployment of all teachers.*" (Emphasis added.) However, entitlement to continuing service status as a teacher is not dependent upon a written contract of employment between the teacher and the board. R.C. 3319.08 also provides that "[i]f the board adopts a motion or resolution to employ a teacher under a limited or continuing contract and the teacher accepts such employment, *the failure of such parties to execute a written contract shall not void such employment contract.*" (Emphasis added.) See, also, *State ex rel. Smith v. Etheridge* (1992), 65 Ohio St.3d 501, 505, 605 N.E.2d 59, 62 ("Ordinarily, R.C. 3319.08 will validate a contract

where the board does not put such contract in writing but the employee performs his or her duties as though a written contract were present.").

{¶ 21} Specifically, ECEA points to the language "the teacher accepts such employment" in R.C. 3319.08, and asserts that, in the absence of a written contract between the teacher and the board, the teacher claiming continuing service status must present affirmative evidence that he or she had in fact accepted a continuing contract offer of employment. In this regard, ECEA claims that McIntosh "has not, and cannot, establish such acceptance." ECEA states that "[t]here is no evidence in the record that [McIntosh] ever responded to the continuing contract offer; and, he did not commence performance pursuant to that offer of a continuing contract. Rather, [McIntosh] expressly accepted the [Marlington] Board's subsequent offer of a limited (one-year) administrative contract of re-employment for the 1975-1976 school year and executed a written contract evidencing that acceptance. Plainly, the parties' express and written agreement that [McIntosh] would be employed pursuant to a limited administrative contract for the 1975-1976 school year precludes a contemporaneous finding that [McIntosh] was employed during that year under a continuing teaching contract."

{¶ 22} We disagree. ECEA misinterprets the statute. In order to accept ECEA's interpretation of R.C. 3319.08, we would have to add language to the statute that simply does not exist. By its very terms, R.C. 3319.08 does not contain language that places an affirmative duty on the teacher to establish that he or she had in fact accepted a continuing contract of employment. Rather, R.C. 3319.08, when read in conjunction with R.C. 3319.11(B)(1), supports a finding that the attainment of continuing service status by an eligible teacher is not dependent upon a written contract of employment between the teacher and a board of education. If, after a teacher attains continuing service status, the board adopts a motion or resolution to employ the teacher under a continuing contract of employment, the teacher will be considered to be employed and serving under a continuing contract

of employment. In fact, the only qualifying condition precedent found in R.C. 3319.11(B)(1) is if the board, by a three-fourths vote, refuses to reemploy the teacher. Here, the board voted to grant McIntosh a continuing contract. In such a case, the teacher will have attained continuing contract status. Thus, we agree with the conclusions reached by the trial court and the panel of judges from the Seventh Appellate District sitting by assignment in the Fifth Appellate District that McIntosh had attained continuing service status as a teacher with Marlington in 1975.

**{¶ 23}** We also reject ECEA's assertion that McIntosh's acceptance of the administrative contract, subsequent to Marlington's vote to offer him a continuing contract of employment, served as a rejection of that offer, thereby waiving his continuing contract status. R.C. 3319.02(C)[3] expressly allows a teacher to accept an administrative position without jeopardizing his or her continuing service status as a teacher. See, also, *Kelley*, *supra*. Therefore, McIntosh did not waive his continuing teaching status upon subsequently accepting the administrative position with Marlington.

## II

**{¶ 24}** In case No. 96-CA-293, a panel of judges from the Ninth Appellate District sitting for the Fifth District Court of Appeals thoroughly reviewed relevant decisions from this court and the United States Supreme Court and concluded that McIntosh was neither a public official nor a public figure for purposes of his defamation claims. This ruling regarding McIntosh's status was, also, subsequently adopted by the panel of judges from the Seventh Appellate District sitting for the Fifth Appellate District in case Nos. 97-CA-50, 97-CA-56 and 97-CA-60, "[s]o as

---

3. R.C. 3319.02(C) states, "When a teacher with continuing service status becomes an assistant superintendent, principal, assistant principal, or other administrator with the district or service center with which the teacher holds continuing service status, the teacher retains such status in the teacher's nonadministrative position as provided in sections 3319.08 and 3319.09 of the Revised Code."

to assure a consistent application of law within the context of the separate defamation claims."

{¶ 25} In *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, the United States Supreme Court held that the constitutional protections afforded by the First and Fourteenth Amendments prohibit a public official from recovering damages for alleged defamatory statements relating to his or her conduct unless the official can establish that the statement was made with actual malice. The court declined, however, to determine "how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of [the actual malice] rule, or otherwise to specify categories of persons who would or would not be included." *Id*., 376 U.S. at 283, 84 S.Ct. at 727, 11 L.Ed.2d at 708, fn. 23. However, guidance was provided later in *Rosenblatt v. Baer* (1966), 383 U.S. 75, 85, 86 S.Ct. 669, 676, 15 L.Ed.2d 597, 605, where the court determined that "the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." The court in *Rosenblatt* also observed that the *New York Times* rule is specifically applicable "[w]here a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees." *Rosenblatt,* 383 U.S. at 86, 86 S.Ct. at 676, 15 L.Ed.2d at 606. And "[t]he employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." *Id*. at 87, 86 S.Ct. at 676, 15 L.Ed.2d at 606, fn. 13.

{¶ 26} This court has not considered the issue whether a public high school principal is a public official for purposes of defamation law. We have, however, in accordance with the *Rosenblatt* guidelines, considered the status of a high school

superintendent and a high school teacher/wrestling coach. In *Scott v. The News-Herald* (1986), 25 Ohio St.3d 243, 25 OBR 302, 496 N.E.2d 699, paragraph two of the syllabus, we held that a public school superintendent is a public official. In *Milkovich v. The News-Herald* (1984), 15 Ohio St.3d 292, 15 OBR 424, 473 N.E.2d 1191, reversed in part on other grounds by *Scott*, *supra*, we determined that an individual is not a public official for purposes of applying the *New York Times* rule in a defamation action by virtue of his employment as a public high school teacher and head wrestling coach.

**{¶ 27}** Courts in other jurisdictions are divided whether public school principals should be accorded public official status. Annotation, Who is "Public Official" for Purposes of Defamation Action (1996), 44 A.L.R.5d 193, 318-323, Section 30. However, we believe that the better view is that principals are not public officials for purposes of defamation law. See, *e.g.*, *McCutcheon v. Moran* (1981), 99 Ill.App.3d 421, 424, 54 Ill.Dec. 913, 425 N.E.2d 1130, 1133 ("The relationship a public school teacher or principal has with the conduct of government is far too remote, in our minds, to justify exposing these individuals to a qualified privileged assault upon his or her reputation."); and *Ellerbee v. Mills* (1992), 262 Ga. 516, 517, 422 S.E.2d 539, 540 ("[U]nder normal circumstances, a principal simply does not have the relationship with government to warrant 'public official' status under *New York Times*. Principals, in general, are removed from the general conduct of government, and are not policymakers at the level intended by the *New York Times* designation of public official.").

**{¶ 28}** Accordingly, we hold that a public school principal is not a public official for purposes of defamation law. We affirm the findings of the Fifth Appellate District in this regard.

**{¶ 29}** We also agree with the Fifth Appellate District that, under the circumstances here, McIntosh is not a "public figure" as defined by *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789, 808.

Specifically, the Fifth District Court of Appeals, in case No. 96-CA-293, aptly observed and held:

"As a high school principal, McIntosh did not assume a role of special prominence in the affairs of society. He did not occupy a position of such persuasive power and influence that he can be deemed a public figure for all purposes as required by *Gertz*. Nor did he thrust himself to the forefront of the public controversy that may have developed concerning his termination. According to the record before us, McIntosh left the high school on March 9, 1995, when ordered to do so by the Superintendent and armed police officers. There is no evidence linking McIntosh to the actions of the students and parents who protested his termination. Nor is there any evidence that McIntosh sought out the media to trumpet his cause. Accordingly, the trial court erred in finding that McIntosh was a public figure and requiring that he be held to the *New York Times* standard of proving actual malice."

{¶ 30} For the foregoing reasons, we affirm the judgments of the Fifth Appellate District with respect to case Nos. 97-2039 and 98-834. The causes are remanded to the Stark County Court of Common Pleas for further proceedings not inconsistent with this opinion.

*Judgments affirmed*
*and causes remanded.*

RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

COOK, J., concurs in part and dissents in part.

MOYER, C.J., dissents.

LUNDBERG STRATTON, J., dissents.

———————————

**COOK, J., concurring in part and dissenting in part.**

{¶ 31} I agree with the majority that McIntosh's status as high school principal did not make him a public official for defamation purposes. I do not

believe, however, that either R.C. 3319.08 or 3319.11(B)(1) supports the majority's conclusion that a teacher eligible for continuing contract status can be presumed to have attained that status just by virtue of having been offered it by a school board. Instead, the statutes require that the teacher without a written contract offer proof of continuing contract status plus acceptance through continued employment with the district.

**{¶ 32}** R.C. 3319.08 pertains to all teaching contracts. It states the general rule that boards of education "*shall* enter into *written* contracts for the employment and reemployment of *all* teachers." (Emphasis added.) It provides only one exception to this rule: "If a board adopts a motion or resolution to employ a teacher under a limited or continuing contract *and the teacher accepts* such employment, the failure of such parties to execute a written contract shall not void such employment contract." (Emphasis added.) Any party seeking to enforce an unwritten contract under this exception, then, must demonstrate that (1) the board adopted the resolution, and (2) the teacher accepted it. Failure to demonstrate these elements will render the unwritten contract void.

**{¶ 33}** The majority concludes that R.C. 3319.08 places no affirmative duty on McIntosh to establish acceptance of the contract. It states that such a requirement would "add language to the statute that simply does not exist." But in *State ex rel. Smith v. Etheridge* (1992), 65 Ohio St.3d 501, 505, 605 N.E.2d 59, 62, this court recognized that R.C. 3319.08 will validate an unwritten contract where the employee can show acceptance by "perform[ing] his or her duties as though a written contract were present." Thus, this court has previously acknowledged that evidence of acceptance is required. To read the statute otherwise is to disregard the statutory phrase "*and the teacher accepts such employment.*"

**{¶ 34}** The majority also relies on R.C. 3319.11(B)(1) in concluding that a continuing contract presumptively exists here. This statute provides that "[u]pon the recommendation of the superintendent that a teacher eligible for continuing

15

service status be reemployed, a continuing contract shall be entered into between the board and the teacher unless the board * * * rejects the recommendation * * *." The majority reads this to say that a contract automatically exists if the board does not reject the recommendation. But to interpret the statute this way presumes that teachers do not decline offers and move on to other employment. Instead, R.C. 3319.11(B)(1) must be read as providing for a second step after a recommendation, *i.e.*, that a contract *shall be entered into*—a step whereby the board and the teacher become parties to a written contract, as required by R.C. 3319.08. Moreover, R.C. 3319.11(B)(1) details exceptions where existence of an unwritten contract will be presumed, and none of those exceptions applies here.

{¶ 35} Reading R.C. 3319.08 and 3319.11(B)(1) together, these statutes require a written contract between the board and the teacher unless one of the few specific exceptions applies. There was no written contract between McIntosh and the Marlington board, and none of the R.C. 3319.11(B)(1) exceptions applies. Therefore, the only statutorily permissible means of establishing this contract is by demonstrating board approval and acceptance by the teacher, pursuant to R.C. 3319.08. It is undisputed that Marlington approved McIntosh for a continuing contract. McIntosh, as the party seeking to enforce the unwritten contract, must then present some evidence of his acceptance of it in accordance with R.C. 3319.08. The evidence shows that McIntosh accepted and began performing an *administrative* contract with the Marlington district immediately after the Marlington board approved his continuing *teaching* contract. Thus, McIntosh has not demonstrated acceptance of the teaching contract and, therefore, has not established his tenured teacher status through his Marlington employment.

{¶ 36} Accordingly, I respectfully dissent from the majority opinion and judgment on this issue.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in the foregoing opinion except to the extent that it concludes that John McIntosh was not a public official for purposes of defamation law.

_____

**MOYER, C.J., dissenting.**

{¶ 37} The majority has, in my view, made two erroneous findings: it has found John McIntosh to be entitled to continuing contract status as a teacher and it has found him to be a private figure for purposes of constitutional defamation law.

{¶ 38} It should also be observed that the majority has failed to address significant issues presented in these appeals, thereby depriving the courts, on remand, of guidance needed to reach a final resolution of this case. Those issues include (1) whether, assuming McIntosh should be deemed a tenured teacher, he should also be deemed a member of the bargaining unit governed by the collective bargaining agreement existing between the Osnaburg Local Board of Education and the East Canton Education Association; (2) whether McIntosh failed to establish, prima facie, the elements of the torts upon which he bases his claims; (3) whether the appellants established the elements of common-law immunity defenses warranting entry of summary judgments in their favor; and (4) whether appellants' speech is protected by Section 11, Article I of the Ohio Constitution, independently of the protection provided by the First Amendment to the Constitution of the United States.

{¶ 39} I write separately to express my view on the first of the omitted issues and to express my opinion regarding the issues decided by the majority.

I

Continuing Contract Status

{¶ 40} I do not disagree with the law stated by the majority in the first paragraph of the syllabus. However, adoption of the syllabus does not mandate the conclusion that John McIntosh should be deemed entitled to tenure as a teacher in

the Osnaburg Local School District. McIntosh simply never obtained continuing contract status as a teacher in the Marlington Local School District. Therefore, continuing contract status could not remain with him when be became employed in the Osnaburg school district.

{¶ 41} Where parties have jointly stipulated to facts, the sole function of the court is to apply the law to the facts placed before it. *Cunningham v. J.A. Myers Co.* (1964), 176 Ohio St. 410, 27 O.O.2d 379, 200 N.E.2d 305. In the case at bar, the parties have stipulated that McIntosh taught under limited (not continuing) teaching contracts through the 1971-1972 school year and that he thereafter served primarily as a guidance counselor under additional limited teaching contracts. Thus, it follows from the express stipulations of the parties that, when the Marlington school board authorized issuance of a continuing contract for the 1975-1976 school year to McIntosh, that authorization was for McIntosh's *first* continuing teacher's contract, with duties to begin in the fall of 1975 and continuing through the spring of 1976.

{¶ 42} In June 1975, however, the Marlington school board offered McIntosh a one-year administrative contract to serve as an assistant principal in the Marlington system for the 1975-1976 school year. McIntosh chose to accept the school board's offer of an administrative contract and served as an assistant principal, rather than a teacher, during the 1975-1976 school year. By choosing to serve as an administrator, McIntosh abandoned any rights he may otherwise have had to insist on the execution of a written continuing teacher's contract for the 1975-1976 school year, or the right to teach that year. One cannot accept employment to simultaneously be both a full-time teacher and a full-time administrator.

{¶ 43} The school board's action in June offering to hire McIntosh as an administrator thus did not occur "after [McIntosh] attain[ed] continuing service status." The first paragraph of the syllabus does not apply to the facts of this case

because McIntosh never accepted the offer of a continuing teacher's contract and never obtained that status. The syllabus describes consequences that follow *after* a teacher has attained continuing service status by both having been offered, *and having accepted*, a continuing contract.

{¶ 44} R.C. 3319.11 indeed creates presumptions that a teacher has accepted employment actually offered, or statutorily required to be offered, by a board of education "unless [the teacher] notifies the board in writing to the contrary on or before the first day of June" preceding the school year to be covered in the contract. R.C. 3319.11(B)(1), (C)(2), (C)(3), (D), and (E). I would hold that any such statutory presumption of acceptance is overcome where, as here, an employee offered both a contract to teach and a contract to serve as an administrator for the same school year chooses to accept the administrator position before having undertaken any teaching activities pursuant to the offered teaching contract. Even though it might otherwise be presumed that acceptance of the school board's offer to employ McIntosh as a teacher for the 1975-1976 school year occurred on June 1, 1975, that presumption is clearly rebutted by the stipulations of the parties as to McIntosh's subsequent actions in failing to undertake tenured teaching responsibilities pursuant to the offered teaching contract in favor of undertaking untenured administrative duties.

## II

### Bargaining Unit Membership

{¶ 45} In failing to address the parties' conflicting arguments as to whether McIntosh is subject to the collective bargaining unit governing teachers at East Canton High School, the majority has presumably left undisturbed the decisions of the appellate courts that he is not a part of the East Canton Education Association bargaining unit. Assuming, as does the majority, that McIntosh is entitled to be recognized as a tenured teacher, I cannot accept the premise that he is not included within that bargaining unit, which is defined as "all certificated personnel employed

by the District [excluding] * * * casual substitutes who work less than (60) days in the same position, and those management, confidential and supervisory employees excluded under 4117 ORC."

{¶ 46} If McIntosh is deemed to be a tenured teacher, he falls within this definition. His right, if any, to legally opt out of membership in the union does not affect his inclusion in the bargaining unit. The conclusions of the appellate court to the contrary are clear error and should be recognized by the majority as such.

III

Constitutional Issues

{¶ 47} Since *New York Times v. Sullivan,* the law has recognized "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 279-280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706. Since 1974, the *New York Times* "actual malice" requirement has applied to plaintiffs found to be public figures as well as public officials. *Gertz v. Robert Welch*, *Inc.* (1974), 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789.

{¶ 48} The majority concludes that John McIntosh was neither a public official nor a public figure as to the controversy surrounding the appellant school board's efforts to terminate him from his position as principal of East Canton High School, a school of approximately three hundred twenty students in a comparatively small community. The legal consequence of such a conclusion is that McIntosh may recover damages if, on remand, he is able to prove that false and defamatory statements concerning him were made by the defendant school administrators and union representatives and that the making of those false statements resulted from mere negligence rather than actual malice, *i.e.*, knowledge that the statements were false or

with reckless disregard as to whether they were false or not. *New York Times v. Sullivan*, *supra.*

{¶ 49} A review of the record and the law causes me to conclude, as did both trial courts in this consolidated case, that John McIntosh was both a public official and a public figure for purposes of his defamation claims and that his failure to proffer proof that appellants acted with actual malice entitles the appellants to summary judgments in their favor as to those claims.

A

Private Figure/Public Official Status

{¶ 50} I do not concur in paragraph two of the syllabus. In adopting the sweeping rule that "[a] public school principal is not a public official for purposes of defamation law," the majority has diminished the likelihood of open, free, and vigorous public debate concerning the operation of public schools and has contradicted this court's prior recognition that " 'debate on public issues should be uninhibited, robust, and wide-open.' " *Seven Hills v. Aryan Nations* (1996)*,* 76 Ohio St.3d 304, 306, 667 N.E.2d 942, 946, quoting *New York Times Co. v. Sullivan*, 376 U.S. at 270, 84 S.Ct. at 721, 11 L.Ed.2d at 701. I am not unmindful of the reality that school administrators as well as school board members are, at times, subjected to harsh and unfair criticism. However, I believe that vigorous debate is indispensable to achieving the goal of improvement of the public schools and ultimately to the vitality of our democratic system.

{¶ 51} Public officials include "at the very least * * * those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt* v. *Baer* (1966), 383 U.S. 75, 85, 86 S.Ct. 669, 676, 15 L.Ed.2d 597, 605. In determining whether any particular government employee is a public official for purposes of a *New York Times* analysis, the test is whether that employee holds a "position in government [that] has such apparent importance that the public has an

independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees." *Rosenblatt* at 86, 86 S.Ct. at 676, 15 L.Ed.2d at 606. Following a comprehensive review of cases, Professor Smolla has concluded that "there are relatively few examples of government-related defamation plaintiffs who are held *not* to be public officials subject to the *New York Times* standard * * * usually [those who] have a peripheral or transient connection to governmental activity, or are extremely low in the organizational hierarchy." (Emphasis *sic*.)  Smolla, Law of Defamation (1998) 2-89 to 2-90, at Section 2.25[1].

{¶ 52} The naming of a public school principal, particularly a high school principal, is an event widely published and discussed in many communities, as is the conduct of such individuals once they undertake the duties of their position.  This is particularly true in small communities the size of East Canton, where only one high school serves the entire community.  Principals in such communities are perceived to have significant influence over the schools they administer and are frequently deemed by the members of the community to be largely responsible for the educational quality of those schools.  In light of the generally held perception that high school principals exercise both responsibility and control over their schools, and because the provision of public education is a governmental function, I believe that many, if not all, public school principals will be found to meet the *Rosenblatt* test.  I further believe that the facts demonstrated by the record before us clearly justify the conclusion that McIntosh should be deemed a public official for purposes of resolving the defamation claims made by him, which clearly were related to McIntosh's continuation in his public position.

{¶ 53} In *Scott v. The News-Herald* (1986), 25 Ohio St.3d 243, 25 OBR 302, 496 N.E.2d 699, this court held, as syllabus law, that a school superintendent is a public official for purposes of defamation law.  I cannot, nor does the majority attempt to, distinguish a school superintendent from a high school principal for purposes of

22

determining public official status. Both are school administrators. Both are responsible for implementing the policies adopted by a local school board. Both are expected to serve as public role models for students. Both exercise supervisory authority over those who have more direct contact with the children of the community. Many of these individuals assume active roles in the life of their greater communities. As did the superintendent in *Scott*, high school principal McIntosh held a position in the community of East Canton in which "[p]ublic scrutiny of [his] official conduct, as well as those aspects of his private life which relate to his suitability for his position, was an inconvenience which he no doubt endured." *Scott,* 25 Ohio St.3d at 256-257, 25 OBR at 313, 496 N.E.2d at 711 (Douglas, J., concurring). Both school superintendents and principals hold positions which invite public scrutiny and discussion concerning them, based solely on the basis of the positions they hold. Cf. *Rosenblatt*, 383 U.S. at 86-87, 86 S.Ct. at 676, 15 L.Ed.2d at 606, fn. 13.

{¶ 54} In observing that we have previously rejected the contention that a high school wrestling coach was a public official, the majority fails to acknowledge that the *Milkovich* classification of a high school wrestling coach as a private figure was subsequently effectively overruled in *Scott*. (" 'To say that Milkovich [the wrestling coach] nevertheless was not a public figure for purposes of discussion about the controversy is simply nonsense.' * * * Accordingly, *we overrule Milkovich in its restrictive view of public officials* and hold a public school superintendent is a public official for purposes of defamation law." [Emphasis added.]) *Scott*, 25 Ohio St.3d at 247-248, 25 OBR at 306, 496 N.E.2d at 704, quoting Justice Brennan, dissenting, *Lorain Journal Co. v. Milkovich* [1985], 474 U.S. 953, 964, 106 S.Ct. 322, 330, 88 L.Ed.2d 305, 313-314.

{¶ 55} The majority cites as "the better view" two cases in which courts in other jurisdictions have refused to find public school principals to be public officials for purposes of defamation law. I cannot agree, nor have the courts that ruled to the contrary in the following cases agreed: *Johnson v. Robbinsdale Indep. School Dist.*

*No. 281* (D.Minn.1993), 827 F.Supp. 1439; *Kapiloff v. Dunn* (1975), 27 Md.App. 514, 343 A.2d 251; *Palmer v. Bennington School Dist.* (1992), 159 Vt. 31, 615 A.2d 498 (elementary school principal); *State v. Defley* (La.1981), 395 So.2d 759, 761.

**{¶ 56}** The facts of a specific case might warrant a finding that a particular public school principal is not required to meet the *New York Times* actual-malice standard in a defamation action even though he or she is deemed to be a public official. This might occur where, for example, the claimed defamatory statement concerning the principal related to purely personal conduct unrelated to either the principal's performance in, or fitness for, his or her position. See *New York Times v. Sullivan*, 376 U.S. at 283, 84 S.Ct. at 727-728, 11 L.Ed.2d at 708, fn. 23; Smolla, *supra*, at 2-100, Section 2.27[2]. Such a result would properly be grounded, however, not on a conclusion that the principal was not a public official, but rather on a failure of the defendant to demonstrate the second prong of the *New York Times* test, *i.e.*, that the alleged defamatory statement "related to" the official conduct of the public official.

**{¶ 57}** I would not hold to a general rule that all public school principals necessarily should be deemed public officials, although I believe that in most cases they will qualify as such. I believe instead that, ultimately, the determination of public official status should be determined on the basis of the particular facts surrounding the alleged defamation. For the same reason, this court should not adopt a broad general rule of syllabus law precluding a finding of public official status as to all public school principals irrespective of the circumstances from which the alleged defamation arises.

B

Private Figure/Public Figure Status

**{¶ 58}** Assuming, *arguendo*, that John McIntosh is not a public official by virtue of holding the position of principal of East Canton High School, his conduct and the circumstances of the dispute in which he was engaged clearly justify the

alternate conclusion that he had become a limited public figure at the time the alleged defamations occurred.

{¶ 59} Public figures "enjoy significantly greater access to the channels of effective communication" and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. *Gertz,* 418 U.S. at 344, 94 S.Ct. at 3009, 41 L.Ed.2d at 808. Any person, regardless of his or her status as a government employee, may become a limited public figure (as opposed to persons who are public figures for all purposes by virtue of their having obtained great power or influence) as to public issues or controversies into which he or she injects himself. Limited public figures are persons who have invited attention and comment by "thrust[ing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808.

{¶ 60} McIntosh brought legal claims of defamation against two groups of defendants. In *State ex rel. McIntosh v. Osnaburg Local School Dist. Bd. of Edn.*, McIntosh claimed that the superintendent of the local school district, the school board, and the individual members of the school board had defamed him in a written notice delivered to him on March 10, 1995 by the superintendent. The notice stated that his termination was being contemplated based on McIntosh's alleged acts of, *inter alia*, immorality, child endangerment, promoting student unrest, and causing a student boycott of classes. In *ECEA v. McIntosh*, McIntosh asserted that representatives of the school district's teachers' union had defamed him in statements issued to the public on March 13, following a school board discussion of his proposed termination. This discussion occurred in a closed executive session, *despite McIntosh's urgings that the meeting be held in public.*

{¶ 61} McIntosh had earlier, in February, been told by the school board, meeting in executive session, that the board was unanimous in its determination that he should be terminated as principal. He was at that time asked to submit his

resignation, which he refused to do. Appellants convincingly argue that McIntosh knew that his position could be salvaged only if the greater community demanded it.

{¶ 62} The majority accepts McIntosh's characterization of himself as a private figure as to the controversy that erupted thereafter when his proposed firing became publicly known. It reaches this conclusion despite the fact that McIntosh repeatedly met with members of the press, provided them with comments concerning the public debate surrounding his termination, and allowed a reporter and photographer access to his home, where his photograph was taken, and the photograph published in a March 11 article. McIntosh not only was actively involved in the controversy—described in a newspaper editorial as one that had "consumed the community"—but also his personal future was at its very center.

{¶ 63} The majority accepts the premise that McIntosh remained a private figure, even though he shared the contents of the allegedly defamatory termination notice with a news reporter after receiving it. The majority affords McIntosh the protection provided by private figure status despite the fact that McIntosh spoke with members of the press one day after the meeting at which the allegedly defamatory statement was read by the union's representative, and McIntosh was quoted as saying, "I think I have a responsibility to speak out, share my views and get things rectified."

{¶ 64} McIntosh clearly attempted to influence the resolution of the public controversy that revolved around him. He acknowledged that shortly after he was told of the board's decision not to renew his contract, it became "public knowledge" that his job as principal was in jeopardy. He not only had access to media channels of communication but effectively utilized them by affirmatively cooperating with the press. Rather than seeking to protect his privacy regarding his firing, he instructed his attorney to request that the school board's discussions concerning his termination occur in open, rather than executive, session. His attorney accordingly requested the

26

school board, in writing, that "all matters relating to the employment status of Mr. John Richard McIntosh with the Osnaburg Local School District be held in a public hearing."

{¶ 65} Having himself participated in the public arena in an attempt to save his job, he must "accept the heat of the fire as part of the price of entering the kitchen." Smolla, *supra*, at 2-22, Section 2.06. Whether he was linked to the actions of students and parents who supported him by participating in civil demonstrations, including student boycotts and ribbon campaigns, is simply not determinative.

{¶ 66} The facts surrounding the events at issue in this case cannot logically support the conclusion that McIntosh was a private figure for purposes of a *Gertz* First Amendment analysis. He is a limited public figure as a matter of law. Because McIntosh did not demonstrate that the appellants acted with actual malice in making the alleged defamatory statements, appellants are entitled to reinstatement of the summary judgments awarded them by the trial courts.

{¶ 67} I therefore dissent to the second paragraph of the syllabus, and to the judgment.

LUNDBERG STRATTON, J., concurs in the foregoing opinion.

_____

**LUNDBERG STRATTON, J., dissenting.**

{¶ 68} I join in Justice Cook's separate opinion and Chief Justice Moyer's dissent, which conclude that R.C. 3319.08 and 3319.11(B) require that the teacher without a written contract offer proof of continuing contract status and proof of acceptance through continued employment with the district. I also join in Chief Justice Moyer's dissent that a public school principal should be found to be a public official for purposes of defamation law.

{¶ 69} However, I write separately to address several issues raised regarding the written statement prepared by the representatives of the East Canton Education Association ("ECEA"). For the reasons that follow, I would find, as the trial court did, that the statements were qualified or conditionally privileged communications under the Ohio and federal Constitutions. Further, as such, I would find that Griffith and Slick, as representatives of ECEA, were acting within the scope of their employment and therefore are not individually liable for damages, and the privileged communication did not constitute intentional interference with the employment contract.

*Privileged Communication*

{¶ 70} Section 11, Article I of the Ohio Constitution provides, "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press." This case presents the court with the task of balancing the free speech rights of Griffith and Slick with the protections afforded McIntosh against defamation.

{¶ 71} Slick and Griffith asserted the defense of privilege. "A privileged communication is one which, except for the occasion on which or the circumstances under which it is made, would be defamatory, and actionable. The defense of privilege is a matter of public policy in furtherance of the right of free speech."

*Costanzo v. Gaul* (1980), 62 Ohio St.2d 106, 108, 16 O.O.3d 134, 135, 403 N.E.2d 979, 981-982.

{¶ 72} Further, "[t]he essential elements of a conditionally privileged communication" are (1) "good faith," (2) "an interest to be upheld," (3) "a statement limited in its scope to this purpose," (4) "a proper occasion," and (5) "publication in a proper manner and to proper parties only." *Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 246, 72 O.O.2d 134, 139, 331 N.E.2d 713, 719, quoting 33 American Jurisprudence (1941) 124-125, Libel and Slander, Section 126. McIntosh appears to dispute only whether the publication was made to proper parties. McIntosh notes that Slick and Griffith published their statement not only to the school board, but also to hundreds of citizens and numerous news reporters who attended the public meeting. The ECEA presented their statement only to the employer board of education. However, McIntosh requested this public forum and insisted that the media had a legitimate interest in the proceedings, so he cannot be heard to complain of the consequences.

{¶ 73} I would find that the ECEA representative, Slick, made this statement in good faith and with a common interest to be upheld, *i.e.*, the consequences to ECEA from McIntosh's employment dispute and from McIntosh's failure to adhere to the process bargained for by the union in contract disputes. Further, the statement was limited in its scope to this purpose. I would also find that the forum, called by McIntosh, was a proper occasion, and the publication was in a proper manner and to proper parties only.

{¶ 74} Accordingly, I believe that the statement made on behalf of the teacher employees of the board of education was a qualified or conditionally privileged communication under the Ohio and federal Constitutions. As such, in the absence of ill motive or malice, the privileged statements are protected. See 50 American Jurisprudence 2d (1995) 694-695, Libel and Slander, Section 365. Therefore, I would find that the appellate court erred in concluding that a question

of material fact remained as to whether ECEA's statement was protected by qualified privilege such that McIntosh was required to establish actual malice in his defamation claims. Because McIntosh failed to prove actual malice, I would find that the trial court's summary judgment should have been upheld.

*Acting Within the Scope of Employment*

{¶ 75} Further, I would find that the ECEA representatives were acting within the scope of their employment and therefore are not individually liable for damages. R.C. 1745.02 provides, "A money judgment against [an] unincorporated *association shall be enforced only against the association as an entity* and *shall not be enforceable against the property of an individual member* of such association." (Emphasis added.) The ECEA is an unincorporated association. Therefore, the court of appeals acknowledged that a judgment rendered against ECEA is against ECEA alone. However, the court of appeals found that the record provided conflicting testimony as to whether Griffith and Slick were acting within the scope of their employment when they prepared and delivered a statement that McIntosh claims was beyond that which was authorized by the members. I disagree.

{¶ 76} "An act of an agent is the act of the principal within the course of the employment when the act can fairly and reasonably be deemed to be an ordinary and natural incident or attribute of the service to be rendered, or a natural, direct, and logical result of it." *Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d 271, 278, 74 O.O.2d 427, 431, 344 N.E.2d 334, 339, citing *Tarlecka v. Morgan* (1932), 125 Ohio St. 319, 181 N.E. 450.

{¶ 77} The ECEA, as the *sole voice* of those it represents, see *In re SERB v. Worthington Classified Assn.* (June 7, 1996), SERB No. 96-009, unreported, authorized Griffith and Slick to make a "neutral" statement supporting the process of "nonrenewing a principal's contract." In my view, the statements made by Slick on behalf of the ECEA were just that, supportive of the process employed by the school board. As such, I would find that Griffith and Slick were acting within the

30

scope of their employment and they cannot therefore be held individually liable in a defamation action.

*No Intentional Interference with Contract*

**{¶ 78}** Finally, I would find that the privileged communication did not constitute intentional interference with the employment contract. "In order to recover for a claim of intentional interference with a contract, one must prove (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 650 N.E.2d 863, paragraph two of the syllabus.

**{¶ 79}** Because I would find that the communication made by the representatives on behalf of ECEA was privileged, the justification prong of *Kenty* is not established. Therefore, I would find that because Griffith and Slick were privileged in making the statement to the board of education, this constitutes justification sufficient to foreclose a tortious-interference claim by McIntosh.

**{¶ 80}** In addition, to the extent that McIntosh argues that the statement to the board of education tortiously interfered with his contract to teach, I would find no interference because, as noted earlier, I join in Justice Cook's dissent finding that McIntosh has not demonstrated acceptance of the teaching contract, and, therefore, has not established his teacher tenure status through his Marlington employment.

**{¶ 81}** Accordingly, I join Chief Justice Moyer's dissent from the majority opinion that a public school principal is not a public official for purposes of defamation law; I also join in Justice Cook's separate opinion and Chief Justice Moyer's dissent on the contract status issue; and I dissent separately and would reverse the portions of the judgment that held that summary judgment on the issue of personal liability for Griffith and Slick was improper, and that the trial court

erred in granting summary judgment as to all claims of tortious interference with contract.

MOYER, C.J., concurs in the foregoing opinion.

_____